IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| MARY ANN L. GLOBOKAR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2023-1984 |
| | ) | |
| NATIONAL AERONAUTICS, | ) | |
| AND SPACE ADMINISTRATION | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**RESPONDENT'S COMBINED
INFORMAL BRIEF AND SUPPLEMENTAL APPENDIX**

Pursuant to Federal Circuit Rule 28(g), respondent, the National

Aeronautics and Space Administration (NASA), respectfully submits this

informal brief in response to the informal brief filed by petitioner Mary Ann

Globokar.

**STATEMENT OF JURISDICTION**

The Initial Decision of the Central Regional Office of the Merit

Systems Protection Board (MSPB or board) was issued on January 23, 2017.

Ms. Globokar timely appealed that initial decision to the full board, which

issued a final decision on April 7, 2023.  On June 1, 2023, Ms. Globokar

filed a timely petition for judicial review within 60 days of the issuance of

the board's final decision.  Pet. for Review, ECF No. 1-2.  This Court

possesses jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1)(A).

## STATEMENT OF THE CASE

I.     Nature Of The Case

*Pro se* petitioner, Mary Ann Globokar, seeks review of a final decision of the Merit System Protection Board (board or MSPB) that denied her request for corrective action under the Federal Erroneous Retirement Coverage Corrections Act (FERCCA). Although Ms. Globokar complains that the MSPB improperly refused to consider her motion for leave to submit supplemental evidence in connection with her appeal to the full board after the record was closed, she does not otherwise allege or identify any error in the board's decision.

II.    Statement Of Facts And Course Of Proceedings Below

Ms. Globokar worked at NASA as a student-trainee from September 28, 1981 until December 23, 1982, and NASA re-hired her on January 8, 1984 as a student-trainee. After completing her degree through a work-study program, Ms. Globokar was appointed as an electronic systems mechanic apprentice in 1985 and continued working for NASA in various positions through at least 2017. SAPPX002.

In May 2016, Ms. Globokar contacted NASA human resources and asserted that the agency erroneously placed her in the Federal Employees' Retirement System (FERS) instead of the Civil Service Retirement System (CSRS).  SAPPX003.  The Federal Employees' Retirement System Act (FERS Act) became effective on June 6, 1986.  *Id.* (citing P.L. 99-335).  Section 8402 of the FERS Act, in relevant part, excludes from FERS coverage "any employee having at least 5 years of civilian service performed before January 1, 1987, creditable under [CSRS]."  5 U.S.C. § 8402(b)(2)(B).  The FERS Act also specifies that individuals hired after December 31, 1983, were eligible to participate in FERS.  *Id.* (citing *Wible v. Dep't of the Army*, 120 M.S.P.R. 333, ¶ 6 (2013)).  NASA determined that Ms. Globokar did not have five years of creditable civilian service in CSRS as of January 1, 1987.  *Id.*  Thus, the agency placed her into the FERS.

In response to Ms. Globokar's challenge, NASA reviewed her retirement records and on August 18, 2016 issued a final decision which determined that she was properly placed into the FERS.  SAPPX003.

In September 2016, Ms. Globokar filed an appeal with the MSPB, which was assigned to the Central Regional Office.  Ms. Globokar did not dispute that she had less than five years of creditable service in the CSRS as of January 1, 1987.  Rather, she argued that she would have met this

requirement had the agency hired her effective June 20, 1983, as specified in

a 1983 NASA memo recommending that she be re-hired effective June 20,

1983 (1983 memo).  SAPPX003.  Ms. Globokar argued that had she been

hired on or before December 31, 1983, and worked continuously as a

Federal employee since then, she would not have been subject to the five-

year creditable service requirement to qualify for the CSRS and would have

not been placed into the FERS.  SAPPX003-4.  Ms. Globokar also argued

that NASA engaged in a prohibited personnel practice under 5 U.S.C.

§ 2302(b)(4), which prohibits an employee from obstructing any person with

respect to his or her right to compete for employment; that NASA was

estopped from placing her into the FERS, because the 1983 memo

constituted a promise to hire her; and, finally, that the 1983 memo was a

binding agreement to hire her effective June 20, 1983, and that the agency

breached that agreement.  SAPPX003-8.

     The record in Ms. Globokar's MSPB appeal closed on December 23,

2016.  SAPPX027.  She waived her right to a hearing.

     In an Initial Decision issued on January 23, 2017, the MSPB's

assigned administrative judge affirmed NASA's final decision that Ms.

Globokar was properly placed in FERS.  First, the administrative judge held

that Ms. Globokar's argument that she should have been placed in the CSRS

4

was based on a selective and incomplete reading of 5 U.S.C. § 8402(b)(1).

SAPPX004.  In full, Section 8402(b)(1) excludes from the FERS individuals

who have performed service in certain positions within the Executive

Service, Senior Executive Service, as a political appointee or in certain other

very high-ranking Federal Government positions continuously since

December 31, 1983.  None of the positions Ms. Globokar held fell into these

categories.  SAPPX005.  Thus, the administrative judge held, even if she had

been appointed as a student-trainee in May 1983, she would not have

qualified for CSRS coverage.  *Id.*

Second, the administrative judge held that Ms. Globokar made her

allegations of a prohibited personnel practice without offering any proof in

support.  SAPPX005.  Rather she relied on suppositions that the delay in

hiring her was due to some willful and deliberate malevolence by the

agency.  *Id.*

Next, the administrative judge found that the agency was not estopped

from placing Ms. Globokar into the FERS.  The administrative judge held

that Ms. Globokar had not shown that any agency official engaged in any

misconduct, and, further, she could not show that she reasonably relied on,

or even knew about, the 1983 memo at the time.  SAPPX006-7.

Finally, the administrative judge held that the 1983 memo was not a binding agreement to hire Ms. Globokar at an earlier date, because she presented no evidence that any of the three agency officials who signed or concurred with the memo had actual authority to bind the United States. SAPPX007-8.

On February 25, 2017, Ms. Globokar appealed to the full board. On July 23, 2017, Ms. Globokar submitted a motion for leave to file supplemental evidence, attaching a December 30, 1983 letter to her from NASA regarding her upcoming employment with NASA. SAPPX030-77. The next day, July 24, 2017, the board responded to Ms. Globokar, informing her that limited pleadings were permitted under 5 C.F.R. § 1201.114, and that for the board to consider any other types of pleadings the party must describe the nature and need for the pleading. SAPPX079-80. In addition, because the record had closed, the board informed Ms. Globokar that she must show that the evidence to be submitted was not readily available before the record closed. *Id*. The board informed Ms. Globokar that her combined motion and additional pleading had been stricken from the e-Appeal Repository and would be returned to her, but that she could resubmit her motion by describing the nature and need for the pleading and showing that the evidence was not readily available before the record closed.

6

*Id.* Ms. Globokar then re-submitted her motion the next day, July 24, 2017,

without the additional evidence, but explaining that the board should

consider the additional document because her previous lawyers were not

diligent and the new document purportedly supported her claim.

SAPPX082-85.  The board confirmed receipt of Ms. Globokar's submission

the next day.  SAPPX087-88.

On April 7, 2023, the full board affirmed the Initial Decision.

SAPPX015-21.  The board concluded that Ms. Globokar failed to establish

any basis under 5 C.F.R. § 1201.115 for granting her petition for review.  In

its final order, the board also denied Ms. Globokar's motion for leave to

submit additional evidence, because the board found Ms. Globokar's

explanation for the submission of additional evidence to be insufficient.  *Id*.

## ARGUMENT

I.     Jurisdiction And Standard Of Review

This Court possesses jurisdiction to review board decisions in civil

service retirement appeals under 5 U.S.C. § 7703(b)(1) and 28 U.S.C.

§ 1295(a)(9). *Lindahl v. Office of Pers. Mgmt*, 470 U.S. 768 (1985);

*Yarbrough v. Office of Pers. Mgmt*, 770 F.2d 1056, 1059 (Fed. Cir. 1985)

("[O]ur jurisdiction embraces appeals from MSPB decisions whose

jurisdiction is founded upon 5 U.S.C. § 8347(d).").  The Court will set aside

board decisions only if found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence.  5 U.S.C. § 7703(c).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).

II.    Response To Informal Brief Questions

      (1)    Has the petitioner ever had another case in this Court?  In a United States District Court?  In the Equal Employment Opportunity Commission?  If so, identify each case.

    No.  We are not aware that Ms. Globokar has any other cases before this Court, a United States District Court, or in the EEOC, which is consistent with the informal brief boxes checked by Ms. Globokar.

      (2)    Did the MSPB incorrectly decide or fail to take into account any facts?  If yes, what facts?

    No.  The board correctly considered and decided the relevant facts.  In her informal brief, Ms. Globokar does not take issue with any of the board's factual findings and has not alleged or identified any error in the board's decision denying her request for corrective action under FERCCA.  Rather, Ms. Globokar challenges the board's decision to deny her untimely motion

to supplement the record, asserting that the board should have taken the additional information into account.  The Court should reject her argument.

Ms. Globokar has not identified any error in the board's decision to deny her motion for leave to file supplemental evidence.  As the board correctly noted, under 5 C.F.R. § 1201.114(A)(5), Ms. Globokar needed to describe the nature of and need for the pleading, and under 5 C.F.R. § 1201.114(k), she needed to demonstrate that the proffered new evidence was new and material and not readily available before the record closed. SAPPX079.  Further, under 5 C.F.R. § 1201.115(d), "new and material evidence" is evidence that, "despite the petitioner's due diligence, was not available when the record closed," and "to constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed."

As the board ruled in its final order, Ms. Globokar's explanation that she "recently found an additional document" that is "compelling evidence to prove her claim for being enrolled in CSRS" was plainly insufficient.  Other than a conclusory assertion that the additional document was "compelling," Ms. Globokar did not explain what it was or how it was material to her claim.  *Cf. Cooperman v. SSA*, No. 2022-1915, 2023 WL 3477288 at *4 (Fed. Cir. May 16, 2023) (per curiam) (finding board did not abuse

discretion to refuse to supplement a closed record under 5 CFR 1201.114(k)

when *pro se* claimant did not "explain[] how any of the emails he sought to

add to the record contained 'new' or 'material' information"); *Brown v.

DOD*, 705 F. App'x 966, 970 (Fed. Cir. 2017) (per curiam) (affirming

board's decision under 5 CFR § 1201.114(a)(5) to reject consideration of

additional affidavits where *pro se* claimant did not demonstrate them to be

material).

      Moreover, Ms. Globokar did not establish that the "newly" discovered

document was unavailable when the record closed and could not have been

obtained earlier with the exercise of due diligence.  This document was a

December 30, 1983, letter from a NASA personnel director addressed to Ms.

Globokar herself, which confirmed an offer and acceptance of employment

to begin in January 1984.  Ms. Globokar offered no explanation that this

letter was not in her possession or that she was not able to locate a copy of it

before the record closed, nor did she offer any explanation whatsoever.  As

such, the board made no error in declining to belatedly accept it into the

record.  *See, e.g.*, *Davis v. USPS*, 487 F. App'x 571, 574–75 (Fed. Cir. 2012)

(per curiam) (affirming board's rejection of new materials submitted with

petition for review where *pro se* claimant "failed to explain [their]

relevance" and "further failed to show that they were previously unavailable

despite his due diligence," noting that the claimant did "not allege that he

could not have obtained these documents earlier with the exercise of due

diligence"); *cf., e.g.*, *Stoglin v. MSPB*, 603 F. App'x 952, 956 (Fed. Cir.

2015) (per curiam) (affirming dismissal of untimely petition for review and

determination of no excusable delay where, "although [*pro se* appellant]

argue[d] the evidence was unavailable prior to the closing of the record, he

[did] not provide[] any evidence that he attempted to obtain the evidence

prior to the close of the record"); *Harding v. VA*, 451 F. App'x 947, 950–51

(Fed. Cir. 2011) (per curiam) (affirming dismissal of late filing and

excluding transcript included with that filing, noting that "[a]lthough the

document itself was not available until March 2010, the evidence contained

therein . . . was available before the record of review closed" and *pro se*

claimant "made no showing that the evidence contained in the transcript was

new or otherwise not readily available").

Ms. Globokar's only apparent explanation for not providing the

purported new evidence earlier in the proceedings is that her former counsel

was negligent.  SAPPX083-84.  But for "purposes of Merit Systems

Protection Board proceedings, an individual is responsible for the errors of

his chosen representative."  *Baugh v. MSPB*, 34 F. App'x 706, 708 (Fed. Cir.

2002) (per curiam).  Ms. Globokar's claims about neglectful counsel are not

a cognizable basis for her to provide additional materials nearly seven months after the record closed and nearly five months after the petition for review was filed.  Even before the administrative judge entered the Initial Decision, Ms. Globokar had requested, and received, an extension of time to file her opposition to the agency's opening submission when her counsel withdrew from representation in December 2016.  SAPPX090-91.  Ms. Globokar, however, did not attempt to present this additional evidence then.

Finally, even if this Court were to consider the additional document offered by Ms. Globokar in her stricken July 23, 2017 motion (which it should not), the document would not change the board's conclusions.  As noted, the new document Ms. Globokar sought to submit was a December 30, 1983, letter from NASA personnel to Ms. Globokar confirming an offer and acceptance of employment.  Ms. Globokar argues that the letter somehow proves she became employed before January 1, 1984.  SAPPX085.  However, by its terms, the December 30, 1983 letter plainly states that her employment with NASA was "to begin on January 9, 1984, at 8 a.m."  Accordingly, this document only reinforces the fact already established in the record that Ms. Globokar was not effectively re-hired by NASA until January 1984.  Even if Ms. Globokar was corresponding with NASA about an employment offer in December 1983, there is no evidence that she

actually reported for duty or performed any service before January

1984. *See Parkin v. MSPB*, 120 F. App'x 349, 350–51 (Fed. Cir. 2005)

(affirming board's rejection of appellant's argument that he was employed

earlier than the effective date on his SF-50 where appellant failed the

statutory definition of "federal employee" over the time period alleged

because there was no evidence he performed any service during that time,

and, thus, he could not have met the definition's requirements that he was

engaged in the performance of a Federal function under the direction of a

Federal supervisor).

Moreover, as the board found, none of Ms. Globokar's employment

qualifies her for the exemption from FERS under 5 U.S.C. § 8402(b)(1),

because all of her employment with NASA was in a general service position.

Thus, the board did not abuse its discretion when it denied Ms.

Globokar's motion to supplement the record and it correctly considered and

decided the relevant facts in connection with her appeal.

(3)    Did the board apply the wrong law?  If yes, what law should
        be applied?

No.  The MSPB correctly applied relevant case law and regulations in

denying Ms. Globokar's motion for leave to supplement the record.  In

response to this question, Ms. Globokar does not identify any incorrect

application of the law but asserts, incorrectly, that the board did not provide a response to her motion until June 11, 2018.

As discussed above, the board promptly addressed Ms. Globokar's July 23, 2017, motion for leave when the next day on July 24, 2017, it rejected the pleading for failure to comply with the 5 C.F.R. § 1201.114 and gave Ms. Globokar an opportunity to resubmit it. After Ms. Globokar did so, the board ruled on Ms. Globokar's motion for leave in its April 7, 2023 final order, correctly applying the standards under 5 C.F.R. § 1201.114 in finding that Ms. Globokar's motion provided an insufficient explanation to supplement the record.

As discussed at length above, the board's decision was consistent with case law and regulations and the board did not abuse its discretion in denying Ms. Globokar's motion.

In addition, although Ms. Globokar does not challenge the board's substantive ruling, the board applied the correct law in determining that Ms. Globokar was not entitled to corrective action under FERCCA. As the board noted, Ms. Globokar's claim largely turned on whether she had five years of civilian service performed before January 1, 1987, to exempt her from the FERS act. SAPPX003-5. The board correctly noted that Ms. Globokar never disputed that she lacked five years of creditable service and concluded

that, under any factual scenario presented by Ms. Globokar, and consistent

with 5 U.S.C. § 8402(b)(2)(B), Ms. Globokar never held a position that was

statutorily excluded from the FERS five-year requirement.  SAPPX005.

Accordingly, consistent with 5 U.S.C. § 8402, the board correctly affirmed

the agency's decision to place Ms. Globkar in the FERS.

Further, the board also correctly concluded that the agency did not

engage in prohibited personnel practices.  As the board stated, public

officers are presumed to perform their duties in good faith and in accordance

with the law and governing regulations unless there is "irrefragable proof" to

the contrary.  SAPPX005 (citing *Lachance v. White*, 174 F.3d 1378, 1381

(Fed. Cir. 1999) and *Marcus v. United States*, 473 F.2d 896, 900 (Fed. Cir.

1973)); SAPPX020 (citing *Preyor v. U.S. Postal Service*, 83 M.S.P.R. 571, ¶

22(1999)).  Ms. Globokar did not provide any proof to support her

allegations that agency employees purposefully delayed her employment,

instead providing only conclusory allegations unsupported by any facts or

evidence.  SAPPX005-6; SAPPX019-20.

The board also correctly concluded that Ms. Globokar did not prove

that the agency should be equitably estopped from placing her in the FERS.

SAPPX006-7; SAPPX020.  As the board observed, for the equitable

estoppel to apply, Ms. Globokar had to show that (1) NASA officials

engaged in affirmative misconduct, and (2) she reasonably relied on that

misconduct. SAPPX006 (citing *Perez Peraza v. Office of Personnel

Management*, 114 M.S.P.R. 457, ¶ 9 (2010)); SAPPX020. As discussed

above, Ms. Globokar did not provide any proof to support her allegations

that agency employees engaged in any affirmative misconduct. Thus, Ms.

Globokar did not prove her equitable estoppel claim.

Moreover, the administrative judge found that, even if Ms. Globokar

could prove that she was entitled to estoppel (which she cannot), that

doctrine is inapplicable in cases such as this one in which Ms. Globokar

seeks variance from the terms of a statute, *i.e.*, the FERS act, that provides

for the payment of money from the United States Treasury. SAPPX007;

SAPPX020. As the administrative judge observed, the Constitution's

Appropriations Clause authorizes only Congress and no other branch of

government to control how Treasury funds are used. SAPPX007. Thus,

equitable estoppel cannot be used to direct payment of such funds when

doing so is contrary to a statute enacted by Congress. SAPPX007 (citing

*Office of Personnel Management v. Richmond*, 496 U.S. 414, 426, 428, 434

(1990)); SAPPX020.

Finally, the board correctly concluded that the 1983 memo was not a

binding agreement to hire Ms. Globokar at an earlier date, because Ms.

Globokar did not present any evidence that any of the three agency officials who signed or concurred in the 1983 memo had actual authority to bind the United States.  SAPPX007-8 (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947)).  Thus, the board applied the correct law in concluding that the 1983 memo did not constitute a binding agreement.

    (4)    Did the board fail to consider important grounds for for relief?  If so, what grounds?

No.  The board considered all relevant grounds, applied the correct law and reached the proper result.  In response to question (4) Ms. Globokar argues, as she did in her motion for leave to supplement the record, that her legal counsel was negligent and responsibility of researching FERS fell on her.  Pet. Br. at 2.  As discussed above, however, the board considered all of Ms. Globokar's arguments and allegations in considering her motion for leave to supplement, and after considering her motion, found that her explanation was insufficient.  SAPPX018.

    (5)    Are there other reasons why the MSPB's decision was wrong?

No.  In response to question (5), Ms. Globokar argues that "all facts of evidence have not been fully considered," by virtue of the board denying her motion for leave to supplement the record.  Pet. Br. at 3.  As discussed above, the board considered Ms. Globokar's argument for supplementing the record and found her explanation insufficient.  Moreover, even if the board

17

had admitted the Ms. Globokar's late evidence, the document would not have changed the board's conclusions.  As discussed above, the new document Ms. Globokar sought to submit was a December 30, 1983, letter from NASA personnel to Ms. Globokar confirming an offer and acceptance of employment.  Ms. Globokar argues that the letter somehow proves she became employed before January 1, 1984.  SAPPX085.  However, by its terms, the December 30, 1983, letter plainly states that her employment with NASA was "to begin on January 9, 1984, at 8 a.m."  Accordingly, this document only reinforces the fact already established in the record that Ms. Globokar was not effectively re-hired by NASA until January 1984.

(6)   <u>What action do you want this Court to take in this case?</u>

This Court should affirm the board's final decision.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court affirm the board's decision.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Miles K. Karson
MILES K. KARSON
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Tel:  (202) 307-0309
Fax:  (202) 353-0461

July 17, 2023                    Attorneys for Respondent

# TABLE OF CONTENTS TO
## RESPONDENT'S SUPPLEMENTAL APPENDIX

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), January 23, 2017,
Initial Decision……………………………………………………..SAPPX001

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), April 7, 2023,
Final Decision.......................................................................................SAPPX015

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), November 29, 2016,
Revised Order Closing The Record…………………………………..SAPPX027

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), July 23, 2017,
Appellant's Motion For Leave To File Supplemental
Evidence…………………………………………………………………SAPPX030

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), July 24, 2017,
Board Response to Appellant's Motion For Leave
To File Supplemental Evidence …………………………………...SAPPX079

*Mary Ann L. Globokar v. National Aeronautics and Space Administration*,
No. CH-0839-16-0596-I-1 (M.S.P.B.), July 24, 2017,
Appellant's Motion For Leave To File Supplemental Evidence ……….SAPPX082

Mary Ann L. Globokar v. National Aeronautics and Space Administration, No.
CH-0839-16-0596-I-1 (M.S.P.B.), July 25, 2017,
Board Acknowledgement of Appellant's Motion For Leave
To File Supplemental Evidence …………………………………...SAPPX087

Mary Ann L. Globokar v. National Aeronautics and Space Administration, No.
CH-0839-16-0596-I-1 (M.S.P.B.), December 8, 2016,
Order Granting Appellant's Request For Extension Of Time………......SAPPX090

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**CENTRAL REGIONAL OFFICE**

| | |
|---|---|
| MARY ANN L.  GLOBOKAR,<br>           Appellant, | DOCKET NUMBER<br>CH-0839-16-0596-I-1 |
| v. | |
| NATIONAL AERONAUTICS AND<br>    SPACE ADMIN,<br>           Agency. | DATE: January 23, 2017 |

Mary Ann L.  Globokar, Strongsville, Ohio, pro se.

James Jackson, Cleveland, Ohio, for the agency.

**BEFORE**
Georgia Vlahos
Administrative Judge

**INITIAL DECISION**

Mary Ann Globokar is a Budget Analyst, GS-560-13, at the agency's John H. Glenn Research Center in Cleveland, Ohio.  *See* Initial Appeal File (IAF), Tab 1.  She appeals under the Federal Erroneous Retirement Coverage Corrections Act (FERCCA),[1] alleging the agency erroneously placed her in the Federal Employment Retirement System (FERS) instead of the Civil Service Retirement

---

[1] FERCCA was enacted as Title III of P.L. 106-265 and is codified at 5 U.S.C. § 8331 Note.  It provides that an employee who has been placed under the wrong retirement system for three or more years since December 31, 1986, is entitled to corrective action under FERCCA § 2003(b).  *Wible v. Department of the Army*, 120 M.S.P.R. 333, ¶7 (2013).

2

System (CSRS) and seeking correction of that error. *Id*. at 13. The Board has jurisdiction over her appeal pursuant to 5 U.S.C. § 8347(d)(1) and 5 C.F.R. § 839.1302. *Poole v. Department of the Army*, 117 M.S.P.R. 516, ¶ 20 (2012). Because the appellant waived her right to a hearing, I decide this appeal on the documentary record. IAF, Tab 6 at 1.

For the reasons set forth below, I AFFIRM the agency's determination that the appellant is not entitled to corrective action under FERCCA.

BACKGROUND

The appellant, then known as Mary Ann Lupica, began working for the agency on September 28, 1981, as a clerk-stenographer student-trainee in a cooperative work-study program. IAF, Tab 1 at 13; Tab 4 at 231-232. In November 1982, she expressed interest in studying electronics and working for the agency as an electronic systems mechanic student-trainee. IAF, Tab 12 at 15. Agency personnel assured her that if she resigned her position to pursue these studies, completed two full-time quarters at college and achieved a minimum grade point average, she would be appointed to such a position. IAF, Tab 12 at 15. The appellant resigned on December 23, 1982, pursued electronics studies and achieved the minimum grade point average. IAF, Tab 12 at 15; Tab 4 at 227.

The agency's Employee Development Specialist together with its Chief of Materials and Engine Components wrote a memorandum dated May 9, 1983 to the agency's Chief of Personnel Management and Employment (the "1983 Memo"). IAF, Tab 12 at 15-16. They reported the appellant's success in meeting all requirements and requested that she be hired as a student-trainee effective June 20, 1983. *Id*. The personnel chief concurred in the memo. *Id*. at 16. However, the appellant was not hired until eight months later, on January 8, 1984. IAF, Tab 4 at 226. She completed her degree through the work-study program, was appointed as an electronic systems mechanic apprentice with the agency in 1985, and continues to work for the agency to this day. IAF, Tab 4 at 218, 225.

The Federal Employees' Retirement System Act (the "FERS Act") became effective on June 6, 1986. P.L. 99-335. Section 8402(b)(2)(B) of the Act, as relevant here, excludes from FERS coverage "any employee having at least 5 years of civilian service performed before January 1, 1987, creditable under [the CSRS]." The FERS Act also specified that individuals hired after December 31, 1983, were eligible to participate in the FERS.[2] *Wible v. Department of the Army*, 120 M.S.P.R. 333, ¶ 6 (2013).

The agency determined that the appellant did not have five years of creditable civilian service in the CSRS as of January 1, 1987. Accordingly, it automatically placed her into the FERS. IAF, Tab 4 at 217. The appellant challenged this action as erroneous in May 2016. IAF, Tab 4 at 68.

On receipt of the appellant's challenge, the agency reviewed her retirement records and in a final decision dated August 18, 2016, determined she was properly placed into the FERS. IAF, Tab 4 at 59-66. The agency's final decision notified the appellant of her right to appeal this decision to the Board. *Id.* The appellant timely filed this appeal on September 16, 2016. IAF, Tab 1. As the appellant acknowledges, she bears the burden of proving by a preponderance of the evidence she should be placed into the CSRS. IAF, Tab 12 at 8.

## ANALYSIS AND FINDINGS

Appellant does not qualify for CSRS exemption

The appellant does not dispute that she had less than five years of creditable service in the CSRS as of January 1, 1987. Instead, she argues that she would have met this requirement had the agency hired her effective June 20, 1983, the date indicated in the 1983 Memo. IAF, Tab 12 at 9, 11-12. The appellant contends that had she been hired on or before December 31, 1983 and

---

[2] Individuals hired after December 31, 1983 were also required to make Old Age, Survivor, and Disability (OASDI) payments into the Social Security retirement system. *Wible*, 120 M.S.P.R. 333, ¶ 6.

worked continuously as a federal employee since then, she would not have been subject to the 5-year creditable service requirement to qualify for the CSRS and would have not been placed into the FERS. *Id.*[3]

The appellant is mistaken. Her recitation of the statutory provision, 5 U.S.C. § 8402(b)(1), on which she bases this argument is selective and incomplete. In full, this provision excludes from FERS coverage:

> any individual who has performed service of a type described in subparagraph (C), (D), (E), or (F) of section 210(a)(5) of the Social Security Act continuously since December 31, 1983 (determined in accordance with the provisions of section 210(a)(5)(B) of the Social Security Act, relating to continuity of employment).

Thus, not all federal service, but just that described in the referenced subparagraphs of the Social Security Act, qualifies a federal employee for CSRS coverage.

Section 210(a)(5) of the Social Security Act is codified as 42 U.S.C. § 410(a)(5)[4] and describes the following categories of federal service in subparagraphs (C), (D), (E), and (F):

(C) service performed as the President or Vice President of the United States,

(D) service performed--

> (i) in a position placed in the Executive Schedule under sections 5312 through 5317 of Title 5,
> (ii) as a noncareer appointee in the Senior Executive Service or a noncareer member of the Senior Foreign Service, or
> (iii) in a position to which the individual is appointed by the President (or his designee) or the Vice President under section 105(a)(1), 106(a)(1), or 107(a)(1) or (b)(1) of Title 3, if the maximum rate of basic pay for such position is at or above the rate for level V of the Executive Schedule,

---

[3] The appellant calls this a "harmful error" that was committed by the agency. It is clear from the records that she means simply that the agency erred and that she is not asserting the affirmative defense of harmful procedural error.

[4] *See* 60 Stat. 979.

(E) service performed as the Chief Justice of the United States, an Associate Justice of the Supreme Court, a judge of a United States court of appeals, a judge of a United States district court (including the district court of a territory), a judge of the United States Court of Federal Claims, a judge of the United States Court of International Trade, a judge of the United States Tax Court, a United States magistrate judge, or a referee in bankruptcy or United States bankruptcy judge,

(F) service performed as a Member, Delegate, or Resident Commissioner of or to the Congress.

These describe positions in the Executive Service, Senior Executive Service, political appointees and other very high ranking federal government positions.  Neither the student-trainee position, GS-0312-3, to which the appellant was appointed in 1984, nor the other General Service (GS) positions in which she has served since fall into any of these categories.  IAF, Tab 1 at 1; Tab 4 at 218-232.  Thus, even if she had been appointed as a student-trainee in May 1983, service in this position would not have qualified her for CSRS coverage.

No prohibited personnel practice

The appellant also alleges that the agency employees who delayed her appointment engaged in a prohibited personnel practice under 5 U.S.C. § 2302(b)(4), which prohibits any employee who has authority to take, direct others to take, recommend, or approve any personnel action from deceiving or willfully obstructing any person with respect to his or her right to compete for employment.  She makes this allegation without offering any proof in support, relying on suppositions that the delay in hiring her was due to some willful and deliberate malevolence by agency personnel well aware of the looming retirement system changes.  Public officers, however, are presumed to perform their duties in good faith and in accordance with the law and governing regulations unless there is "irrefragable proof" to the contrary. *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999). *See also Marcus v. United States*, 473 F.2d 896, 900 (Fed. Cir. 1973) (presumption of regularity of official action required court to suppose that valid reasons existed for the official decision

unless it affirmatively appeared that the reason was something improper, or the action was taken without reason).

The record is replete with evidence of the agency's concern for, and good conduct in connection with, the appellant.   Agency officials recommended a course of action to her when she was a young clerical work-study employee working as a GS-3 that ultimately resulted in permanent, much higher-paying employment as a GS-13 with the agency.   And although they recommended this course without offering her "any formal commitment for a position in her new career field," the agency honored their assurances.  IAF, Tab 12 at 15.  Finally, although the appellant alleges the officials delayed hiring her because they knew the law was about to change to her detriment (IAF, Tab 12 at 11), this could not have been the case.  The FERS Act was not enacted until June 6, 1986, two and a half years after the appellant was hired.  PL 99-335.[5]  Thus, the record reveals nothing that overcomes the presumption that agency officials acted properly.

<u>Agency is not estopped from placing appellant into the FERS</u>

To the extent the appellant is arguing the agency should be estopped[6] from placing her into the FERS and refusing to place her into the CSRS, her argument fails.  When estoppel is sought against federal government officials, an appellant must prove (1) the officials engaged in affirmative misconduct by the officials and (2) she reasonably relied on that misconduct.  *Perez Peraza v. Office of Personnel Management*, 114 M.S.P.R. 457, ¶ 9 (2010).  She has failed to prove either of these prongs.

---

[5] The appellant refers to an amendment to the Social Security Act made by PL 98-21 which was enacted on April 20, 1983.  Although the FERS Act (PL 99-335) cites the Social Security Act and uses some of its definitions, the FERS Act was not enacted and did not establish the FERS until June 6, 1986, more than three years later.

[6] Equitable estoppel is a "doctrine preventing one party from taking unfair advantage of another when, through false language or conduct, the person to be estopped has induced another person to act in a certain way, with the result that the other person has been injured in some way."  *See* ESTOPPEL, *Black's Law Dictionary* (10th ed. 2014).

First, as noted above, the appellant has not borne her burden of proving the agency, through its officials, alleged in any misconduct.  Second, to the extent the 1983 Memo constitutes a promise to hire her on an earlier date, the appellant cannot show she reasonably relied on any such promise or in fact that she relied on the document at all.  She was not copied on the 1983 Memo and admits she first came upon the document years later when reviewing a paper version of her official personnel file.  IAF, Tab 12 at 10.  Thus, she was not aware of, and could not have relied on, the recommended start date.

Moreover, even if the appellant proved she was entitled to estoppel, that doctrine is inapplicable in cases such as this one in which the appellant seeks variance from the terms of a statute (the FERS Act) that provides for the payment of money from the U.S. Treasury.  The appellant is in essence asking the Board to compel the payment of a larger amount of money from the Treasury funds than she would receive if she remains in the FERS.  The Supreme Court has ruled that the Constitution's Appropriations Clause[7] authorizes only Congress and no other branch of government to control how Treasury funds are used.   Thus, equitable estoppel cannot be used to direct payment of such funds when doing so is contrary to a statute enacted by Congress.  *Office of Personnel Management v. Richmond*, 496 U.S. 414, 426, 428, 434 (1990).

No binding agreement to hire appellant at an earlier date

The appellant's remaining argument is equally unavailing.  She appears to be arguing that the 1983 Memo constitutes a binding agreement to hire her as an electronics student trainee, effective June 20, 1983, and that the agency breached this agreement.  As the agency points out, she has presented no evidence that any of the three agency officials who signed or concurred in the 1983 Memo had actual authority to bind the United States.  *See Federal Crop Insurance*

---

[7] U.S.C.A. Const. Art. I, § 9, cl. 7.

*Corporation v. Merrill*, 332 U.S. 380, 384-385 (1947). Absent such authority, the agreement cannot be held to be binding on the agency.

For the foregoing reasons, I find the appellant has failed to prove by preponderance evidence that the agency erred in placing her in the FERS and I further find that she is not entitled to corrective action under FERCCA.[8]

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:                    _____/S/_____
                                 Georgia Vlahos
                                 Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **February 27, 2017**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals. The paragraphs that follow tell you how and

---

[8] The agency moved to strike the appellant's rebuttal (IAF, Tab 15), which was filed on December 27, 2016, four days after the record closed. IAF, Tab 8. I find the arguments in the rebuttal to be repetitive of those the appellant raised in her earlier argument in support of her appeal. IAF, Tab 12. Because the rebuttal does not respond to new evidence or argument, I find the agency's motion well founded and hereby strike the rebuttal.

when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently only one member is in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least one additional member is appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition

or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice to the Appellant Regarding Your Further Review Rights," which sets forth other review options.

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the

documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5

C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**NOTICE TO AGENCY/INTERVENOR**

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

**NOTICE TO THE APPELLANT REGARDING
YOUR FURTHER REVIEW RIGHTS**

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit. You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after the date this initial decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be

13

dismissed.  *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right.  It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012).  You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

If you are interested in securing pro bono representation for your court appeal, that is, representation at no cost to you, the Federal Circuit Bar Association may be able to assist you in finding an attorney.  To find out more, please click on this link or paste it into the address bar on your browser:

https://fedcirbar.org/Pro-Bono-Scholarships/Government-Employees-Pro-Bono/Overview-FAQ

The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Mail          Mary Ann L.  Globokar
                         20265 Bradgate Lane
                         Strongsville, OH 44149

Agency Representative

Electronic Mail          James Jackson
                         National Aeronautics and Space Admin
                         21000 Brookpark Road
                         Mail Stop 142-7
                         Cleveland, OH 44135

January 23, 2017                      /s/
(Date)                                Yvonne B. Robery
                                      Paralegal Specialist

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

| | |
|---|---|
| MARY ANN L. GLOBOKAR,<br>　　　　　Appellant, | DOCKET NUMBER<br>CH-0839-16-0596-I-1 |
| 　　v. | |
| NATIONAL AERONAUTICS AND<br>　SPACE ADMIN,<br>　　　　　Agency. | DATE: April 7, 2023 |

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Mary Ann L. Globokar, Strongsville, Ohio, pro se.

James Jackson, Esquire, and James P. Burkes, Esquire, Cleveland, Ohio, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member[2]

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

[2] Member Leavitt's name is included in decisions on which the three-member Board completed the voting process prior to his March 1, 2023 departure.

## FINAL ORDER

¶1        The appellant has filed a petition for review of the initial decision, which denied her request for corrective action under the Federal Erroneous Retirement Coverage Corrections Act (FERCCA).  Generally, we grant petitions such as this one only in the following circumstances:  the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed.  Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).  After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review.  Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision.  5 C.F.R. § 1201.113(b).

## BACKGROUND

¶2        The appellant was employed as a Budget Analyst.  Initial Appeal File (IAF), Tab 1.  She contacted agency human resources staff in May 2016 and asserted that the agency erroneously placed her in the Federal Employees' Retirement System (FERS) instead of the Civil Service Retirement System (CSRS).  IAF, Tab 4 at 68.  She stated that, although she did not have the requisite 5 years prior to the creation of the FERS to exclude her from automatic FERS coverage, she should have been given the requisite 5 years of service because the agency intended her to enter on duty prior to her actual start date.  *Id.* at 67-68.  In support of her claim, she submitted a May 9, 1983 letter that requested that she

enter on duty on June 20, 1983, which was prior to her actual entrance-on-duty date on January 8, 1984. *Id.* at 71-72, 226.

¶3      On August 18, 2016, the agency issued a decision determining that the appellant was not entitled to corrective action under FERCCA because she did not have the requisite 5 years of service on December 31, 1986, that would exclude her from automatic placement into FERS.[3] *Id.* at 59-60. The agency included a worksheet that indicated that the appellant had 4 years, 3 months and 19 days of service from September 1981 to December 31, 1986, and that, regardless of the letter requesting that she enter on duty on June 20, 1983, the documentation reflected that she did not enter on duty until January 8, 1984. *Id.* at 61.

¶4      The appellant filed the instant appeal requesting corrective action under FERCCA.[4] IAF, Tab 1. She filed a brief in which she asserted, among other things, that she was not required to serve 5 years to avoid automatic FERS coverage because of her interpretation of 5 U.S.C. § 8402(b)(1), which waived the 5-year rule for certain individuals. The administrative judge issued an initial decision on the basis of the documentary evidence affirming the agency's determination. IAF, Tab 16, Initial Decision (ID). She found that the appellant was properly and automatically placed into the FERS, that the agency did not

---

[3] FERCCA addresses the problems created when employees are in the wrong retirement plan for an extended period. 5 U.S.C. § 8331 Note; *Poole v. Department of the Army*, 117 M.S.P.R. 516, ¶ 13 (2012); 5 C.F.R. § 839.101(a). An employee may seek relief under FERCCA if the employee experienced a "qualifying retirement coverage error," defined as an "erroneous decision by an employee or agent of the Government as to whether Government service is CSRS covered, CSRS Offset covered, FERS covered, or Social Security–Only covered that remained in effect for at least 3 years of service after December 31, 1986." 5 C.F.R. § 839.102. We agree with the administrative judge that the Board has jurisdiction over this appeal under 5 U.S.C. § 8347(d)(1) and 5 C.F.R. § 839.1302 because the appellant asserted that her service, including 1981 to the present, was CSRS covered and she sought correction of an error in the agency's decision regarding that service. IAF, Tab 16, Initial Decision (ID) at 1-2.

[4] The appellant originally requested a hearing but later waived that request and agreed that the matter could be decided on the basis of the documentary evidence. IAF, Tabs 1, 6.

commit a prohibited personnel practice, that the agency was not estopped from placing the appellant into the FERS, and that there was no binding agreement to hire the appellant at an earlier date.  ID at 3-8.

¶5      The appellant has filed a petition for review, the agency has responded in opposition to her petition, and the appellant has filed a reply.[5]  Petition for Review (PFR) File, Tabs 1-2, 5.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶6      The Federal Employees' Retirement System Act of 1986 (the "FERS Act") became effective on June 6, 1986.  Pub. L. No. 99-335, 100 Stat. 514 (codified at 5 U.S.C. chapter 84).  Pursuant to the FERS Act, an employee that had at least 5 years of civilian service performed before January 1, 1987, that is creditable under the CSRS, is covered under the CSRS, unless that individual elected to participate in the FERS.  5 U.S.C. § 8402(b)(2)(B).  However, the FERS Act excludes from automatic coverage certain high-ranking individuals in certain situations, including, among others, the President and Vice President of the United States, members of the Senior Executive Service, noncareer members of the Senior Foreign Service, presidential appointees, and judges, as specified by the Social Security Act, who performed service continuously from December 31, 1983.  5 U.S.C. § 8402(b)(1); 42 U.S.C. § 410(a)(5)(C), (D), (E), and (F).

---

[5] The appellant also has filed a motion for leave to submit additional evidence.  Petition for Review (PFR) File, Tab 7.  Pleadings allowed on review include a petition for review, a cross petition for review, a response to a petition for review, a response to a cross petition for review, and a reply to a response to a petition for review.  5 C.F.R. § 1201.114(a).  No other pleading will be accepted unless the party files a motion with and obtains leave from the Clerk of the Board.  5 C.F.R. § 1201.114(a)(5).  Such a motion must describe the nature of and need for the pleading.  *Id.*  In her motion, the appellant proposes to submit "an additional document which supports her claim for retirement classification" and further states that she has "found compelling evidence to prove her claim for being enrolled in CSRS; hence to prove entitlement to corrective action for retirement reclassification as allowed under FERCCA legislation."  PFR File, Tab 7 at 4.  We find this explanation insufficient and deny the appellant's motion.

¶7      The appellant argues that she can rely upon the May 1983 letter in support of her claim against automatic placement into the FERS. PFR File, Tab 1 at 7-8. She asserts that the letter is relevant and admissible hearsay evidence because it demonstrates that she was eligible and qualified for hire for entrance on duty on June 20, 1983, on the basis of her successful completion of the hiring requirements. *Id.* The appellant does not dispute that, in fact, she did not have 5 years of covered service before January 1, 1987. Further, as the agency points out, even if the appellant had accrued the additional covered service had the agency hired her on June 20, 1983, instead of January 8, 1984, she still would not have satisfied the requirement of 5 years of service.[6] IAF, Tab 4 at 13. Accordingly, consistent with 5 U.S.C. § 8402(b)(2)(B), the appellant was properly placed in the FERS retirement program. Further, regardless of whether the appellant had entered on duty prior to December 31, 1983, as the administrative judge stated, neither the student trainee position to which she was appointed, nor the General Schedule Electronic Systems Mechanic Apprentice position to which she was converted, were included in the aforementioned positions that were statutorily excluded from the 5-year requirement. ID at 5; IAF, Tab 4 at 218-32; 42 U.S.C. § 410(a)(5)(C), (D), (E), and (F). Accordingly, consistent with 5 U.S.C. § 8402, the agency properly and automatically placed the appellant in the FERS.

¶8      Nevertheless, the appellant reasserts that before 1986, agency officials knew or should have known about the upcoming enactment of the FERS Act on the basis of prior legislation and executive actions that foreshadowed the FERS Act and that she should not be required to prove how the agency's ignorance of the laws affected her. PFR File, Tab 1 at 5-7. However, as the administrative

---

[6] Prior to January 1, 1987, the appellant had 4 years, 2 months, and 19 days of service and the additional service from June 20, 1983, to January 8, 1984, would have added less than 7 months, totaling less than the requisite 5 years of service. IAF, Tab 4 at 13, 61, 217-32; *see* 5 U.S.C. § 8402(b)(2)(B).

judge stated, it is well settled that public officers are presumed to perform their duties in good faith.  ID at 5; *see, e.g.*, *Preyor v. U.S. Postal Service*, 83 M.S.P.R. 571, ¶ 22 (1999).  We find the appellant's assertion that agency officials delayed her entrance on duty from June 20, 1983, to January 8, 1984, to interfere with her rights under the FERS Act, which was not enacted until 1986, is insufficient to overcome this presumption.  *See Preyor*, 83 M.S.P.R. 571, ¶ 22 (finding that there was nothing in the record to suggest that agency officials promoted the appellant to deny him appeal rights, and thus the appellant failed to rebut the presumption that public officials performed their duties in good faith and in accordance with law and regulations).

¶9     Next, the appellant challenges the administrative judge's finding that she did not prove that the agency should be equitably estopped from placing her in the FERS.  PFR File, Tab 1 at 7.  She asserts that the agency and the administrative judge improperly required her to prove that the agency committed misconduct.  *Id.*  She further asserts that it would be impossible for someone to prove misconduct regarding the delay in processing her paperwork when this delay occurred over 30 years ago, but that a reasonable person could infer that the hiring date was significantly later, thus indicating circumstances, conditions, events, or situations that caused the delay.  *Id.*  As the administrative judge stated, however, even if the appellant had proven that the agency had engaged in misconduct thus entitling her to equitable estoppel,[7] this doctrine is inapplicable when, as here, the appellant is seeking variance from the terms of the FERS, which would involve a larger payment from the U.S. Treasury.  ID at 7; *see Office of Personnel Management v. Richmond*, 496 U.S. 414, 416 (1990) (stating that payments of moneys from the Federal treasury are limited to those authorized by

---

[7] As the administrative judge explained, when seeking equitable estoppel in a case against Federal Government officials, an appellant must show that (1) the officials engaged in affirmative misconduct, and (2) she reasonably relied upon the misconduct.  ID at 6-7; *Perez Peraza v. Office of Personnel Management*, 114 M.S.P.R. 457, ¶ 9 (2010).

statute, and the Government cannot be estopped from denying benefits not otherwise permitted by law solely on equitable grounds); *Resnick v. Office of Personnel Management*, 120 M.S.P.R. 356, ¶ 11 (2013).

¶10       The appellant emphasizes that, regardless of the cause, it was through no fault of her own that she was placed in the FERS. *Id.* at 8. Nevertheless, pursuant to 5 U.S.C. § 8402(b)(2)(B), she did not have the requisite 5 years of service to exclude her from coverage under the FERS. Therefore, we find that she is not entitled to corrective action under FERCCA.[8]

¶11       Accordingly, we affirm the initial decision.

### NOTICE OF APPEAL RIGHTS[9]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all

---

[8] The appellant has attached legislative and executive documents to her petition for review and reply. PFR File, Tab 1 at 10-27, Tab 5 at 8-11. To the extent that these documents were not submitted below before the administrative judge, we have not considered this evidence. *See Avansino v. U.S. Postal Service*, 3 M.S.P.R. 211, 214 (1980) (finding that, under 5 C.F.R. § 1201.115, the Board will not consider evidence submitted for the first time with the petition for review absent a showing that it was unavailable before the record was closed despite the party's due diligence). The appellant has failed to demonstrate why she could not have submitted this evidence prior to the close of the record below.

[9] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[10]  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

---

[10]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:                    /s/ for

                                  Jennifer Everling
                                  Acting Clerk of the Board
Washington, D.C.

CERTIFICATE OF SERVICE

I certify that this Order was sent today to each of the following:


Electronic Mail        Mary Ann L. Globokar
20265 Bradgate Lane
Strongsville, OH 44149

Electronic Mail        James Jackson
National Aeronautics and Space Admin
21000 Brookpark Road
Mail Stop 142-7
Cleveland, OH 44135

Electronic Mail        James P. Burke
National Aeronautics and Space Admin
NASA Glenn Research Center
Office of the Chief Counsel - Code G
21000 Brookpark Road, M.S. 142-7
Cleveland, OH 44135


| April 7, 2023 | /s/ |
|---|---|
| (Date) | Tawanda Williams |
|  | Paralegal Specialist |

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**CENTRAL REGIONAL OFFICE**

| | |
|---|---|
| MARY ANN L.  GLOBOKAR,<br>                    Appellant, | DOCKET NUMBER<br>CH-0839-16-0596-I-1 |
|                v. | |
| NATIONAL AERONAUTICS AND<br>     SPACE ADMIN,<br>                         Agency. | DATE: November 29, 2016 |

## REVISED ORDER CLOSING THE RECORD

This Order supersedes Paragraph 4 of the Summary of Telephonic Preliminary Status Conference and Order Closing the Record ("Summary and Order") issued on October 20, 2016.  By a filing submitted November 29, 2016, the parties requested an extension of the deadlines set forth in the previous order. Accordingly, those deadlines are revised as follows:

This appeal will be decided on the documentary record, including the submissions to be made by the parties as follows:

**I ORDER** the appellant to file argument and evidence in support of her request for corrective action under FERCCA and addressing the issues raised by the agency in its response.  The appellant must do so on or before **December 9, 2016**.

**I ORDER** the agency to file a reply to the appellant's filing on or before **December 23, 2016**.

The record in this appeal will close on **December 23, 2016.**  All evidence and argument must be filed by that date.  Evidence and related argument filed

after that date will not be accepted unless the party submitting the evidence shows that it is new and material evidence that was not available before the record closed.  Notwithstanding the close of the record, however, pursuant to 5 C.F.R. § 1201.59(c), a party must be allowed to respond to new evidence or argument submitted by the other party just before the close of the record.

All other representations, statements, requirements and provisions in the Summary and Order issued October 20, 2016 remain the same.

FOR THE BOARD:    _____/S/_____

Georgia Vlahos
Administrative Judge

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Mail

Mary Ann L.  Globokar
20265 Bradgate Lane
Strongsville, OH 44149

Appellant Representative

Electronic Mail

Tyler Patterson
Tully Rinckey Pllc
4100 Vestal Road, Suite 104
Vestal, NY 13850

Agency Representative

Electronic Mail

James Jackson
National Aeronautics and Space Admin
21000 Brookpark Road
Mail Stop 142-7
Cleveland, OH 44135

| November 29, 2016 | /s/ |
| --- | --- |
| (Date) | Yvonne B. Robery |
| | Paralegal Specialist |

BEFORE THE UNITED STATES
MERIT SYSTEMS PROTECTION BOARD
CENTRAL REGIONAL OFFICE

| | | |
|---|---|---|
| _____ ) | | |
| MARY ANN L. GLOBOKAR, ) | | Docket No.:  CH-0839-16-0596-I-1 |
| ) | | |
| Appellant, pro se ) | | |
| ) | | Administrative Judge |
| v. ) | | Georgia Vlahos |
| ) | | |
| NATIONAL AERONAUTICS AND ) | | |
| SPACE ADMINISTRATION, ) | | |
| ) | | |
| Agency. ) | | DATE:  July 23, 2017 |
| _____ ) | | |

APPELLANT'S  MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE

Appellant hereby files this motion for leave on July 23, 2017 to file supplemental

evidence to be considered by the MSPB Board regarding Appellant's PETITION FOR

REVIEW to determine if Appellant is entitled to corrective action under FERCCA for

being placed in the CSRS retirement system.

RATIONALE FOR ALLOWING SUPPLEMENTAL EVIDENCE

Appellant, in good faith, relied on legal counsel to file a pleading on her behalf

appealing Agency decision of not being allowed retirement correction under FERCCA

legislation.  Appellant retained legal representation from Tully Rinckey, PLLC (TR-

PLLC), and depended upon the guidance and expertise of the representative assigned by

the law firm, to her detriment.

Appellant initiated her pleading on September 16, 2016 with legal representation

retained from TR-PLLC.  Appellant was given assurances, in a letter from TR-PLLC,

stating their dedication to providing superior service "throughout the process until the legal matter has been resolved".  On December 7, 2016, two days prior to Appellant's brief submission deadline, the TR-PLLC attorney contacted Appellant via phone and advised Appellant to "not" file the brief.  Appellant stated her wishes to continue with filing the brief, and the next day, December 8, 2016, the attorney removed himself as "representative", leaving the Appellant with less than 48 hours to submit her brief on December 9, 2017.  Appellant sought and was granted a one-week extension to prepare her brief, and filed brief by new approved deadline of December 16, 2016.

The TR-LLC legal attorney was derelict and negligent in the performance of his duties to advise and represent the Appellant, and did not follow through with due diligence into the research of Federal retirement legislation pertaining to Appellant's case.  He had filed a one-week extension, solely based on his personal reasons, and then three (3) business days into that one-week extension, he verbally advised Appellant not to file.  Attorney refused to proceed with filing Appellant's brief, in good faith as promised by TR-LLC, and stated he withdrew from the case at Appellant's direction.  He repeatedly and persistently suggested that Appellant not dial in for the Preliminary Status Order held October 13, 2016.   Appellant dialed in, despite the attorney's insistence not to, and during the phone conference, the TR-LLC attorney conferred that a hearing was not necessary for Appellant's case.  Appellant, afterwards, questioned and challenged this "decision" to waive her right to a hearing, and the attorney emphatically coerced Appellant that a hearing was not necessary and that it would not look good for the record

2

if Appellant chose to alter the Preliminary Order Status.  He also had another associate

call to convince Appellant of the same.

Appellant conducted her own research into the retirement and social security laws

and the specifics to the Agency hiring process and procedures during the latter half of

1983, which led up to her eventually being hired.  Appellant recently found additional

information which supports her claim for retirement reclassification allowed under

FERCCA legislation, and wishes for it to be considered as part of the record.

To summarize, here are the reasons for granting leave for Appellant to file

supplemental evidence:

1.  Attorney did not rightfully and ethically advise and represent Appellant in

good faith.

2.  Attorney did not follow through with due diligence in researching and

applying the appropriate legislations in support of Appellant's pleading.

3.  Attorney was derelict in his role, removing himself as "representative"

due to his lack of preparation, negligence and his own reluctance to file

Appellant's brief.

4.  Appellant relied upon legal representation from TR-LLC, to her detriment,

and was left with short notice, to proceed pro se, to conduct her own research

into the myriad of legislations affecting Appellant's pleading for rightful

enrollment in the CSRS retirement system.

These are Appellant's reasons, justifications and plea to the honorable court, for

granting leave to file supplemental evidence.

3

SAPPX032

<u>APPELLANT'S EMPLOYMENT OFFER AND ACCEPTANCE OCCURRED **PRIOR**
TO THE JANUARY 1, 1984 EFFECTIVE DATE OF FERS LEGISLATION</u>

Appellant presents an official memo addressed to her from the Personnel Director,

Paul E. Cline, dated December 30, 1983, which confirms the oral contract of the Agency

employment offer and Appellant's acceptance of being hired by the NASA Lewis

Research Center [see EXHIBIT 3].  Appellant requests that this memo be allowed for

submission as significant and compelling proof that Appellant was hired prior to

December 30, 1983.

Appellant was technically hired *prior* to January 1, 1984, the effective date of the

newly impending legislation under Public Law 98-168[1] as stated in Sec. 202 (6):

> (6) that such employees and officers **who are first employed** in civilian
> service by the Government or first take office in civilian service in the
> Government **on or after January 1, 1984**, become subject to such **new
> Government retirement system as may be established for employees** and
> officers of the Government on or after January 1, 1984, and before January 1,
> 1986, with credit for service performed after December 31, 1983, by such
> employees and officers transferred to such new Government retirement
> system.

Black's Legal Dictionary states that "employ" is the term equivalent to "hiring",

which implies a request and a contract for compensation[2]. Appellant entered into a

contract for employment by the Agency, sometime prior to December 30, 1983, and

hence was hired prior to the last day before the new legislation went into effect.

---

[1] PL 98-168--Nov.29, 1983, (97 STAT. 1107), Title II, Sec. 202 (6)
[2] See *"What is EMPLOY?"*, Black's Law Dictionary (Online 2nd Edition).

4

SAPPX033

Black's Legal Dictionary defines "CONTRACT" as an agreement, upon sufficient consideration, to do or not do a particular thing[3]. The consideration was to hire the Appellant (the Agency offer), to which Appellant accepted and therefore makes the contract legally binding. Appellant entered into a contract with the Agency, as recorded in EXHIBIT 3, and was "hired" prior to the legislation transition date of January 1, 1984. GAO's publication "Federal Retirement – Implementation of the Federal Employees Retirement System"[4] specifically states the legislative cutoff date on Page 2, Executive Summary:

> "The Social Security Amendments of 1983 provided that all federal civilian employees **first hired after December 31, 1983**, would be covered by Social Security".

Furthermore, GAO Decision B-158844, sets precedence for Federal appointments in which employment relationships can be established with verbal affirmation of offer and if there is evidence of such acceptance[5]. EXHIBIT 3 is the written record of the verbal contract which is evidence and proof of Appellant's affirmation and acceptance of employment offer from the Agency.

It is apparent that the hiring process was prompted by the initial memo from the Training office, dated May 9, 1983, which stated the directive and intent to hire Appellant by June 20, 1983 [refer to EXHIBIT 1]. EXHIBIT 3 proves that the Agency had intentions to hire Appellant at least since May 9, 1983, as initially promised and Agency finally followed through with that promise sometime prior to December 30,

---

[3] See *"CONTRACT"*, Black's Law Dictionary (Online 2nd Edition).
[4] GAO "Federal Retirement – Implementation of the Federal Employees Retirement System" August 1988
[5] GAO Decision B-158844 "Appointments Acceptance Requirement" APR. 28, 1966, 45 COMP. GEN. 660

1983.   EXHIBIT 3 is the written record of the verbal contract between Appellant and Agency, drafted by the Agency related to Appellant's claim.  Any inconsistencies or ambiguities must be construed against the maker of this memo - the Agency.

EXHIBIT 3 validates that Appellant was hired *prior* to January 1, 1984, prior to the effective date of the new retirement legislation under PL 98-168.  This submission further justifies Appellant's plea for corrective action for retirement reclassification as allowed under FERCCA legislation, which was specifically created to correct classification errors, due to various ambiguous and subtle misinterpretations, as in this case.  Appellant respectfully requests for the MSPB to recognize and affirm that Appellant was hired prior to December 31, 1983, the cutoff date for CSRS.  Appellant respectfully requests that the MSPB order the Agency to make the necessary corrections and adjustments for Appellant to be enrolled into the CSRS retirement system, and to award all demands in Appellant's initial brief, and incorporated herein by reference.

Respectfully Submitted,

_____
Mary Ann L. Globokar
Appellant, pro se
20265 Bradgate Lane
Strongsville, OH 44149
Phone: (440) 785-7689
maryglobokar@att.net

6

National Aeronautics and
Space Administration

**EXHIBIT 3**



**Lewis Research Center**
Cleveland, Ohio
44135

ply to Attn of:  1140/C5T

December 30, 1983

Ms. Mary Ann J. Lupica
6861 Talbot Drive
Parma, OH  44129

Dear Ms. Lupica:

This confirms your recent telephone conversation with our Mr. McCreary leading to your acceptance of a Electronics Systems Mechanic Student Trainee position in the NASA Lewis Research Center Trades Apprentice Cooperative Education Program.  This position is classified at the Wage Grade 1 level with a beginning hourly rate of $7.33.

We have scheduled your employment to begin on January 9, 1984 at 8 a.m. You should report to the receptionist in the Lobby of the Development Engineering Building for new employee processing and orientation.  Please bring your social security card with you as it will be needed for payroll verification purposes.

We look forward to having you join our staff and are confident that your association with Lewis will prove both challenging and rewarding.  In the meantime, should you have any questions, please call Mr. McCreary at 433-4000, extension 5300.

Sincerely,

Paul E. Cline
Personnel Director

Enclosures

cc:
✓7200/R. G. Hoffman
1140/Official File

1140/ARWycoff:csa:12-30-83



25th Anniversary
1958-1983

PUBLIC LAW 98-168—NOV. 29, 1983          97 STAT. 1105

Public Law 98-168
98th Congress

An Act

To amend title 5, United States Code, to extend the Federal Physicians Comparability Allowance Act of 1978, and for other purposes.

Nov. 29, 1983
[H.R. 2077]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Federal
Physicians
Comparability
Allowance Act of
1978,
amendment.
Federal
Physicians
Comparability
Allowance
Amendments of
1983.
5 USC 5948 note.

## TITLE I—PHYSICIANS COMPARABILITY ALLOWANCE

### SHORT TITLE

SEC. 101. This title may be cited as the "Federal Physicians Comparability Allowance Amendments of 1983".

### EXTENSION OF AUTHORITY

SEC. 102. (a) The second sentence of section 5948(d) of title 5, United States Code, is amended to read as follows: "No agreement shall be entered into under this section later than September 30, 1987, nor shall any agreement cover a period of service extending beyond September 30, 1989.".

(b) Section 3 of the Federal Physicians Comparability Allowance Act of 1978 (5 U.S.C. 5948 note) is amended by striking out "September 30, 1985" and inserting in lieu thereof "September 30, 1989".

### PAY OF CERTAIN FEDERAL PHYSICIANS FOR FISCAL YEAR 1982

SEC. 103. (a) Any individual whose aggregate pay for fiscal year 1982 exceeded the limitation set forth in section 5383(b) of title 5, United States Code, is relieved of all liability to the United States for any amounts paid to such individual in excess of such limitation if, and to the extent that, such liability takes into account any allowance paid under section 5948 of such title.

5 USC 5948 note.

5 USC 5948.

(b)(1) The appropriate agency head shall pay, out of any appropriation or fund available to pay allowances under section 5948 of title 5, United States Code, to any individual as to whom liability is relieved under subsection (a), an amount equal to the aggregate of any amounts paid by such individual, or withheld from sums otherwise due such individual, with respect to any liability relieved under such subsection.

(2) A payment under paragraph (1)—

(A) shall be made only if written application therefor is submitted to the appropriate agency head, in accordance with such regulations as the President or his designee may prescribe, within two years after the date of enactment of this Act; and

(B) shall not be considered for purposes of applying the limitation set forth in section 5383(b) of title 5, United States Code.

(c) For the purpose of this section—

Definitions.



97 STAT. 1106          PUBLIC LAW 98-168—NOV. 29, 1983

(1) the term "aggregate pay", as used with respect to an individual, means the aggregate amount paid to such individual under sections 4507, 5382, 5384, and 5948 of title 5, United States Code;

(2) the term "appropriate agency head", as used with respect to an individual, means the head of the agency employing such individual when such individual was paid an allowance with respect to which liability is relieved under this subsection; and

5 USC 5948.

(3) the term "agency" has the meaning given such term by section 5948(g)(2) of such title.

## TITLE II—FEDERAL EMPLOYEES RETIREMENT ADJUSTMENT

Federal
Employees'
Retirement
Contribution
Temporary
Adjustment Act
of 1983.
5 USC 8331 note.

### SHORT TITLE

Sec. 201. This title may be cited as the "Federal Employees' Retirement Contribution Temporary Adjustment Act of 1983".

### STATEMENT OF POLICY

5 USC 8331 note.

Sec. 202. It is the policy of the Government—

(1) that the amount required to be contributed to certain public retirement systems by employees and officers of the Government who are also required to pay employment taxes relating to benefits under title II of the Social Security Act for service performed after December 31, 1983, be modified until the date on which such employees and officers are covered by a new Government retirement system (the design, structure, and provisions of which have not been determined on the date of enactment of this Act) or January 1, 1986, whichever is earlier;

42 USC 401.

(2) that the Treasury be required to pay into such retirement systems the remainder of the amount such employees and officers would have contributed during such period but for the temporary modification;

(3) that the employing agencies make contributions to the retirement systems with respect to such service in amounts required by law in effect before January 1, 1984, without reduction in such amounts;

(4) that such employees and officers accrue credit for service for the purposes of the public retirement systems in effect on the date of enactment of this Act until a new Government retirement system covering such employees and officers is established;

(5) that, where appropriate, deposits to the credit of such a retirement system be required with respect to service performed by an employee or officer of the Government during the period described in clause (1), and, where appropriate, annuities be offset by the amount of certain social security benefits attributable to such service; and

(6) that such employees and officers who are first employed in civilian service by the Government or first take office in civilian service in the Government on or after January 1, 1984, become subject to such new Government retirement system as may be established for employees and officers of the Government on or after January 1, 1984, and before January 1, 1986, with credit for service performed after December 31, 1983, by such em-

ployees and officers transferred to such new Government retirement system.

## DEFINITIONS

Sec. 203. (a) For the purposes of this title—

(1) the term "covered employee" means any individual whose service is covered service;

(2) the term "covered retirement system" means—

(A) the Civil Service Retirement and Disability System under subchapter III of chapter 83 of title 5, United States Code;

(B) the Foreign Service Retirement and Disability System under chapter 8 of the Foreign Service Act of 1980 (22 U.S.C. 4041 et seq.);

(C) the Central Intelligence Agency Retirement and Disability System under the Central Intelligence Agency Retirement Act of 1964 for Certain Employees (50 U.S.C. 403 note); and

(D) any other retirement system (other than a new Government retirement system) under which a covered employee who is a participant in the system is required to make contributions to the system in an amount equal to a portion of the participant's basic pay for covered service, as determined by the President;

(3) the term "covered service" means service which is employment for the purposes of title II of the Social Security Act and chapter 21 of the Internal Revenue Code of 1954 by reason of the amendments made by section 101 of the Social Security Amendments of 1983 (97 Stat. 67); and

(4) the term "new Government retirement system" means any retirement system which (A) is established for officers or employees of the Government by or pursuant to a law enacted after December 31, 1983, and before January 1, 1986, and (B) takes effect on or before January 1, 1986.

(b) The President shall publish the determinations made for the purpose of subsection (a)(2)(D) in an Executive order.

*5 USC 8331 note.*

*5 USC 8331.*

*42 USC 401.
26 USC 3101
et seq.*

*Executive order,
publication.*

## CONTRIBUTION ADJUSTMENTS

Sec. 204. (a) In the case of a covered employee who is participating in a covered retirement system, an employing agency shall deduct and withhold only 1.3 percent of the basic pay of such employee under—

(1) section 8334 of title 5, United States Code;

(2) section 805 of the Foreign Service Act of 1980 (22 U.S.C. 4045);

(3) section 211 of the Central Intelligence Agency Retirement Act of 1964 for Certain Employees (50 U.S.C. 403 note); or

(4) any provision of any other covered retirement system which requires a participant in the system to make contributions of a portion of the basic pay of the participant;

for covered service which is performed after December 31, 1983, and before the earlier of the effective date of a new Government retirement system or January 1, 1986. Deductions shall be made and withheld as provided by such provisions in the case of covered service which is performed on or after such effective date or Janu-

*5 USC 8331 note.*

ary 1, 1986, as the case may be, and is not subject to a new Government retirement system.

(b) Employing agencies of the Government shall make contributions with respect to service to which subsection (a) of this section applies under the second sentence of section 8334(a)(1) of title 5, United States Code, the second sentence of section 805(a) of the Foreign Service Act of 1980 (22 U.S.C. 4045(a)), the second sentence of section 211(a) of the Central Intelligence Agency Retirement Act of 1964 for Certain Employees (50 U.S.C. 403 note), and any provision of any other covered retirement system requiring a contribution by the employing agency, as if subsection (a) of this section had not been enacted.

REIMBURSEMENT FOR CONTRIBUTION DEFICIENCY

Definitions.
5 USC 8331 note.

Sec. 205. (a) For purposes of this section—

(1) the term "contribution deficiency", when used with respect to a covered retirement system, means the excess of—

(A) the total amount which, but for section 204(a) of this Act, would have been deducted and withheld under a provision referred to in such section from the pay of covered employees participating in such retirement system for service to which such section applies, over

(B) the total amount which was deducted and withheld from the pay of covered employees for such service as provided in section 204(a) of this Act; and

(2) the term "appropriate agency head" means—

(A) the Director of the Office of Personnel Management, with respect to the Civil Service Retirement and Disability System under subchapter III of chapter 83 of title 5, United States Code;

5 USC 8331.

(B) the Secretary of State, with respect to the Foreign Service Retirement and Disability System under chapter 8 of the Foreign Service Retirement Act of 1980 (22 U.S.C. 404 et seq.);

22 USC 4041
et seq.

(C) the Director of Central Intelligence, with respect to the Central Intelligence Agency Retirement and Disability System under the Central Intelligence Agency Retirement Act of 1964 for Certain Employees (50 U.S.C. 403 note); and

(D) the officer designated by the President for that purpose in the case of any retirement system described in section 203(a)(2)(D) of this Act.

(b) At the end of each of fiscal years 1984, 1985, and 1986, the appropriate agency head—

(1) shall determine the amount of the contribution deficiency for such fiscal year in the case of each covered retirement system, including the interest that those contributions would have earned had they been credited to the fund established for the payment of benefits under such retirement system in the same manner and at the same time as deductions under the applicable provision of law referred to in section 204(a) of this Act; and

Secretary of the
Treasury,
notification.

(2) shall notify the Secretary of the Treasury of the amount of the contribution deficiency in each such case.

(c) Before closing the accounts for each of fiscal years 1984, 1985, and 1986, the Secretary of the Treasury shall credit to the fund established for the payment of benefits under each covered retire-

ment system, as a Government contribution, out of any money in the Treasury not otherwise appropriated, an amount equal to the amount determined under subsection (b) with respect to that covered retirement system for the fiscal year involved.

(d) Amounts credited to a fund under subsection (c) shall be accounted for separately than amounts credited to such fund under any other provision of law.

### SPECIAL DEPOSIT AND OFFSET RULES RELATING TO RETIREMENT BENEFITS FOR INTERIM COVERED SERVICE

SEC. 206. (a) For the purposes of this section, the term "interim covered service" means covered service to which section 204(a) applies.     5 USC 8331 note.

(b)(1) Paragraphs (2) and (3) apply according to the provisions thereof only with respect to a covered employee who is employed by the Government on December 31, 1983.

(2)(A) Notwithstanding any other provision of law, the interim covered service of such covered employee shall be considered—

(i) in determining entitlement to and computing the amount of an annuity (other than a disability or survivor annuity) commencing under a covered retirement system during the period beginning January 1, 1984, and ending on the earlier of the date a new Government retirement system takes effect or January 1, 1986, by reason of the retirement of such covered employee during such period only if such covered employee makes a deposit to the credit of such covered retirement system for such covered service in an amount computed as provided in subsection (f); and

(ii) in computing a disability or survivor annuity which commences under a covered retirement system during such period and is based in any part on such interim covered service.

(B) Notwithstanding any other provision of law, an annuity to which subparagraph (A)(ii) applies shall be reduced by the portion of the amount of any benefits which is payable under title II of the Social Security Act and is attributable to the interim covered service     42 USC 401. considered in computing the amount of such annuity, as determined under subsection (g), unless, in the case of a survivor annuity, a covered employee has made a deposit with respect to such covered service for the purposes of subparagraph (A)(i) before the date on which payment of such annuity commences.

(3) Notwithstanding any other provision of law, if a new Government retirement system is not established or is inapplicable to such a covered employee who retires or dies subject to a covered retirement system after the date on which such new Government retirement system takes effect, the interim covered service of such covered employee shall be considered in determining entitlement to and computing the amount of an annuity under a covered retirement system based on the service of such covered employee only if such covered employee makes a deposit to the credit of such covered retirement system for such covered service in an amount computed as provided in subsection (f).

(c)(1) Paragraphs (2) and (3) apply according to the provisions thereof only with respect to a covered employee who was not employed by the Government on December 31, 1983.

(2) Notwithstanding any other provision of law, any annuity which commences under a covered retirement system during the

Pleading Number : 2017030184     Submission date : 2017-07-23 12:53:27     Confirmation Number: 1207307408     page 15 of 52

97 STAT. 1110          PUBLIC LAW 98–168—NOV. 29, 1983

42 USC 401.

period described in subsection (b)(2)(A)(i) and is based, in any part, on interim covered service shall be reduced by the portion of the amount of any benefits which is payable under title II of the Social Security Act to the annuitant and is attributable to such service, as determined under subsection (g).

(3) Notwithstanding any other provision of law, if a new Government retirement system is not established, the interim covered service of such a covered employee who retires or dies after January 1, 1986, shall be considered in determining entitlement to and computing the amount of an annuity under a covered retirement system based on the service of such covered employee only if such covered employee makes a deposit to the credit of such covered retirement system for such covered service in an amount computed as provided in subsection (f).

(d) If a covered employee with respect to whom subsection (b)(3) or (c)(3) applies dies without having made a deposit pursuant to such subsection, any individual who is entitled to an annuity under a covered retirement system based on the service of such covered employee or who would be entitled to such an annuity if such deposit had been made by the covered employee before death may make such deposit after the date of death of such covered employee. Service covered by a deposit made pursuant to the first sentence shall be considered in determining, in the case of each individual to whom the first sentence applies, the entitlement to and the amount of an annuity under a covered retirement system based on the service of such covered employee.

42 USC 401.

42 USC 415.

(e) A reduction in annuity under subsection (b)(2)(B) or (c)(2) shall commence on the first day of the first month after the date on which payment of benefits under title II of the Social Security Act commence and shall be redetermined each time an increase in such benefits takes effect pursuant to section 215(i) of the Social Security Act. In the case of an annuity of a participant or former participant in a covered retirement system, of a surviving spouse or child of such participant or former participant, or of any other person designated by such participant or former participant to receive an annuity, under a covered retirement system (other than a former spouse) the reduction in annuity under subsection (b)(2)(B) or (c)(2) shall be calculated before any reduction in such annuity provided under such system for the purpose of paying an annuity under such system to any former spouse of such participant or former participant based on the service of such participant or former participant.

(f) For the purposes of subsection (b) or (c), the amount of a deposit to the credit of the applicable covered retirement system shall be equal to the excess of—

(1) the total amount which would have been deducted and withheld from the basic pay of the covered employee for the interim covered service under such covered retirement system but for the application of section 204(a), over

(2) the amount which was deducted and withheld from such basic pay for such interim covered service pursuant to section 204(a) and was not refunded to such covered employee.

42 USC 401.

(g) For the purpose of subsections (b)(2)(B) and (c)(2), the portion of the amount of the benefits which is payable under title II of the Social Security Act to an individual and is attributable to interim covered service shall be determined by—

(1) computing the amount of such benefits including credit for such service;

PUBLIC LAW 98–168—NOV. 29, 1983          97 STAT. 1111

(2) computing the amount of such benefits, if any, without including credit for such service; and

(3) subtracting the amount computed under clause (2) from the amount computed under clause (1).

(h) The Secretary of Health and Human Services shall furnish to the appropriate agency head (as defined in section 205(a)(2)) such information as such agency head considers necessary to carry out this section. *Information submittal.*

### TRANSFER OF CREDIT TO NEW RETIREMENT SYSTEM

Sec. 207. (a) Any covered employee who first becomes employed in civilian service by the Government or first takes office in civilian service in the Government on or after January 1, 1984, shall become subject to such new Government retirement system as may be established. *5 USC 8331 note.*

(b) In the case of any covered employee who is subject to a covered retirement system on or after January 1, 1984, and thereafter becomes subject to a new Government retirement system—

(1) credit for the service of such employee to which section 204(a) applies shall be transferred from such covered retirement system to the new Government retirement system for the purposes of the new Government retirement system; and

(2) such service shall be considered not to be creditable service for the purposes of such covered retirement system,

effective on the date on which such employee becomes subject to such new Government retirement system.

### ELECTIONS BY CERTAIN COVERED EMPLOYEES

Sec. 208. (a) Any individual performing service of a type referred to in clause (i), (ii), (iii), or (iv) of section 210(a)(5) of the Social Security Act beginning on or before December 31, 1983, may— *5 USC 8331 note.*

*Ante, p. 67.*

(1) if such individual is then currently a participant in a covered retirement system, elect by written application submitted before January 1, 1984—

(A) to terminate participation in such system, effective after December 31, 1983; or

(B) to remain under such system, as if the preceding sections of this Act and the amendments made by this Act had not been enacted; or

(2) if such individual is then currently not a participant in a covered retirement system, elect by written application—

(A) to become a participant under such system (if such individual is otherwise eligible to participate in the system), subject to the preceding sections of this Act and the amendments made by this Act; or

(B) to become a participant under such system (if such individual is otherwise eligible to participate in the system), as if the preceding sections of this Act and the amendments made by this Act had not been enacted.

(b) An application by an individual under subsection (a) shall be submitted to the official by whom such covered employee is paid.

(c) Any individual who elects to terminate participation in a covered retirement system under subsection (a)(1)(A) is entitled to have such individual's contributions to the retirement system refunded, in accordance with applicable provisions of law, as if such *Refund of retirement contributions.*

97 STAT. 1112        PUBLIC LAW 98-168—NOV. 29, 1983

individual had separated from service as of the effective date of the election.

(d) Any individual who is eligible to make an election under subparagraph (A) or (B) of subsection (a)(1), but who does not make an election under either such subparagraph, shall be subject to the preceding sections of this Act and the amendments made by this Act.

### TITLE III—SENIOR EXECUTIVE SERVICE

Report to
Congress.
5 USC 5383 note.

SEC. 301. (a) The Office of Personnel Management shall study and, within 12 months after the date of enactment of this Act, submit to each House of the Congress a report on the effect which section 5383(b) of title 5, United States Code (relating to the maximum aggregate amount payable to a member of the Senior Executive Service in a fiscal year) has had with respect to recruitment, retention, and morale of career appointees in the Senior Executive Service.

(b) Section 3135(a)(7) of title 5, United States Code, is amended to read as follows:

"(7) for the preceding fiscal year, by agency—

"(A) the number of performance awards, and the number of ranks, conferred, as well as the respective aggregate amounts paid for such awards and ranks;

"(B) the percentage of career appointees in such agency who received any such award, and the percentage who received any such rank; and

"(C) the name of each individual who received any such award or rank, the award or rank received, and a brief summary of the reasons why such individual was selected;".

Approved November 29, 1983.

LEGISLATIVE HISTORY—H.R. 2077 (S. 1009):

HOUSE REPORT No. 98-542 (Comm. of Conference).
SENATE REPORTS: No. 98-218 accompanying S. 1009 (Comm. on Governmental
        Affairs) and No. 98-307 (Comm. of Conference).
CONGRESSIONAL RECORD, Vol. 129 (1983):
        Sept. 19, considered and passed House.
        Sept. 30, considered and passed Senate, amended, in lieu of S. 1009.
        Nov. 4, House concurred in Senate amendment with an amendment; Senate
            concurred in House amendment with an amendment.
        Nov. 11, Senate agreed to conference report.
        Nov. 16, House agreed to conference report.

**United States General Accounting Office**

# GAO

Report to the Chairman, Committee on
Post Office and Civil Service, House of
Representatives

August 1988

# FEDERAL RETIREMENT

## Implementation of the Federal Employees Retirement System



GAO/GGD-88-107

042902/136497

Pleading Number : 2017030184     Submission date : 2017-07-23 12:53:27     Confirmation Number: 1207307408     page 20 of 52



**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**General Government Division**

B-230387

August 4, 1988

The Honorable William D. Ford
Chairman, Committee on Post Office
  and Civil Service
House of Representatives

Dear Mr. Chairman:

This report responds to your request that we review the implementation of the Federal
Employees Retirement System Act of 1986. It examines the actions taken by the agencies
with governmentwide responsibilities for implementing the new retirement system and
internal efforts by units of two agencies to explain the new system and available options to
their employees.

We are sending copies of this report to selected committees of Congress; the Secretaries of
Labor and the Army; the Directors, Office of Management and Budget and Office of
Personnel Management; the Administrator of Veterans Affairs; the Acting Commissioner of
Social Security; the Executive Director, Federal Retirement Thrift Investment Board; and
other interested parties.

Sincerely yours,

*Rosslyn S. Kleeman*

Rosslyn S. Kleeman
Senior Associate Director

# Executive Summary

## Purpose

The Federal Employees Retirement System Act of 1986 created a new retirement system for federal civilian employees hired after December 1983. Because of the significance and complexity of the act, the Chairman, House Committee on Post Office and Civil Service, asked GAO to assess the act's implementation. (See pp. 8 to 9.)

## Background

The Social Security Amendments of 1983 provided that all federal civilian employees first hired after December 31, 1983, would be covered by Social Security. As a result, Congress established a new federal retirement system to incorporate Social Security benefits. The new system provides benefits from three separate components, each implemented and subsequently administered by different agencies. The Office of Personnel Management is responsible for the pension plan; the newly created Federal Retirement Thrift Investment Board is responsible for the tax-deferred thrift savings plan, which is made up of government and employee contributions; and the Social Security Administration is responsible for the Social Security benefit.

Employees hired before January 1, 1984, could elect to transfer to the new system during an open season from July 1987 through December 1987 or continue to be covered by one of several previously existing retirement systems, primarily the civil service retirement system. All civilian employees, regardless of retirement system coverage, can participate in the thrift savings plan; but employees must be in the new retirement system to receive government contributions to their savings accounts. (See pp. 8, 9, 14, and 15.)

## Results in Brief

The Office of Personnel Management carried out its implementation responsibilities under the act well. It issued information on the policies and procedures necessary to have the pension plan in place by January 1, 1987, as the act required, and developed and made available substantial information to assist employees in making their decisions about transferring to the new retirement system. (See p. 10.)

About 2.8 percent of eligible employees covered by the civil service retirement system transferred to the new plan. A total of about 700,000 employees, including transfers and new hires, were in the new plan as of March 1988. (See pp. 8 and 21.)

Despite delays in appointing Thrift Board members and other start-up problems, the Board implemented the thrift plan in less than 6 months.

Pleading Number : 2017030184      Submission date : 2017-07-23 12:53:27      Confirmation Number: 1207307408      page 22 of 52

Executive Summary

Many of the start-up problems occurred because of coordination problems with over 600 payroll offices. Considering this short time frame and the tasks involved in establishing a new agency and a new plan, GAO believes the Thrift Board has carried out its responsibilities well. (See pp. 14 and 17.)

# GAO's Analysis

**Pension Plan Implementation**

The Office of Personnel Management began issuing information on policies and procedures to implement the legislation shortly after the act was signed and completed necessary actions to make the plan operational by January 1, 1987. It developed numerous materials to help employees covered by the old retirement system understand the factors they needed to consider in making a transfer decision. These materials included an orientation pamphlet, a transfer handbook, videos, a training course for employees assigned to assist coworkers in making their transfer decisions, and a computer model that compared benefits available from both retirement systems. (See pp. 8 and 10 to 11.)

**Automation of Records for New Pension Plan**

The Office of Personnel Management contracted for the development of an automated system for the new pension plan's records. The automated system is expected to be implemented in October 1991. Until then, these records are being handled by the same system used for civil service retirement records. (See pp. 11 to 12.)

**Retirement Counselor Training**

As required by the act, the Office of Personnel Management established an annual training program for agency retirement counselors and provided for regular communications with the counselors on pension plan developments. (See p. 12.)

**Thrift Plan Implementation**

The thrift plan became operational on April 1, 1987, with the establishment of about 600,000 accounts for employees covered by the new system. Approximately $180 million was deposited in these accounts to cover the period January 1, 1984, to April 1, 1987. By May 1988, the thrift plan had over 1 million accounts valued at over $1.6 billion. About 45 percent of employees covered by the new system and 20 percent of

employees covered by the civil service system were contributing to the thrift plan at that time. (See pp. 14 to 16.)

Delays in presidential appointments of Board members caused the thrift plan's implementation date to slip from January 1, 1987, to April 1, 1987. Delays in the distribution of the first open season materials and in fully implementing the loan program were also experienced, but they were primarily the result of coordination problems with agency payroll offices and agency difficulties with meeting Thrift Board time frames. (See pp. 17 to 19.)

## Actions by the Social Security Administration and Department of Labor

The Social Security Administration developed a special process to provide employees with Social Security earnings and coverage information for use in determining if they should transfer. From May to December 1987, about 950,000 employees received this information. (See p. 13.)

In 1987, the Department of Labor contracted with two accounting firms to develop an audit program to review fiduciary standards at the Thrift Board. In 1988, the firms will make an audit of fiduciary standards and review selected agency payroll offices with high employee participation rates. (See p. 20.)

## Transfers to the New Retirement System at Selected Facilities

Agency officials at the 12 Department of the Army and 11 Veterans Administration facilities GAO visited said employees received the transfer handbook explaining the provisions of the old and new retirement systems. In addition, certain employees at these facilities were trained as "decision advisors" to assist coworkers with their transfer decisions and were provided with computer models to compare retirement benefits from each system. Briefings, video presentations, and individual counseling sessions were also made available, but most employees did not attend them. (See pp. 21 to 24.)

According to the Office of Personnel Management, about 2.8 percent of eligible employees transferred to the new system. At the 23 facilities GAO visited, transfer rates ranged from 0.7 to 4.2 percent. (See pp. 21 and 26.)

Two of the reasons cited by officials concerning why employees did not transfer to the new system were that (1) employees planned to make the federal government a career and believed the civil service retirement system offered greater benefits to career employees and (2) employees

SAPPX050

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 24 of 52

lacked trust in some aspect of the design or stability of the new retirement system. (See pp. 23 and 24.)

## Recommendations

This report provides information on the status of the FERS implementation and therefore contains no recommendations.

## Agency Comments

GAO sought the views of responsible agency officials during the course of its work and incorporated them where appropriate. Office of Personnel Management, Thrift Board, and Department of Labor officials informally reviewed the report and agreed with the information presented.

# Contents

| | | |
|---|---|---|
| **Executive Summary** | | 2 |
| **Chapter 1**<br>**Introduction** | FERS Implementation<br>Objective, Scope, and Methodology | 8<br>8<br>9 |
| **Chapter 2**<br>**Implementation of the**<br>**Pension Plan** | | 10 |
| | OPM Established the New Pension Plan and Provided<br>    Guidance to Agencies | 10 |
| | Automation of FERS Pension Plan Records | 11 |
| | Retirement Counselor Training | 12 |
| | SSA Implementation Activities | 13 |
| **Chapter 3**<br>**Implementation of the**<br>**Thrift Savings Plan** | | 14 |
| | Thrift Investment Board | 14 |
| | Thrift Savings Plan | 15 |
| | Start-Up Problems | 17 |
| | Monitoring the Responsibilities of Thrift Board<br>    Fiduciaries | 19 |
| **Chapter 4**<br>**FERS Open Season**<br>**Implementation at**<br>**Selected Army and VA**<br>**Facilities** | | 21 |
| | Distribution of FERS Information | 21 |
| | Decision Advisors Were Trained and Available to Assist<br>    Employees | 21 |
| | Briefings Were Available but Not Well Attended | 22 |
| | Computer Model Estimates Were Generally Available | 22 |
| | Individual Counseling Sessions Were Available | 23 |
| | Views on Why More Employees Did Not Transfer to FERS | 23 |
| **Appendix** | Transfer Rates at Army and VA Facilities Included in<br>    GAO Review | 26 |

SAPPX052

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 26 of 52

Contents

## Abbreviations

| | |
|---|---|
| CSRS | Civil Service Retirement System |
| FERS | Federal Employees Retirement System |
| OPM | Office of Personnel Management |
| SSA | Social Security Administration |
| VA | Veterans Administration |

SAPPX053

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 27 of 52

Chapter 1

# Introduction

The Social Security Amendments of 1983 (Public Law 98-21), primarily intended to resolve financial difficulties in the Social Security system, had a significant effect on the retirement program for future federal employees. The amendments required that all federal civilian employees first hired since December 31, 1983; former employees returning to federal employment after a break in service of 1 year or more; and elected and politically appointed officials be covered by the Social Security program. Civilian employees of the government who were employed before January 1984 were generally not in Social Security. Most of them were covered by the civil service retirement system.

On June 6, 1986, the President signed the Federal Employees Retirement System (FERS) Act of 1986 (Public Law 99-335). The act specified that FERS would be in place on January 1, 1987, and effective retroactively to January 1, 1984. FERS has three components: Social Security, a pension plan with benefits based on salary and length of service, and a thrift savings plan to which employees and their agencies contribute. The act gave employees covered by the previously existing retirement systems a one-time opportunity to transfer to FERS during an open season between July 1 through December 31, 1987.[1] As of March 1988, approximately 700,000 federal employees were covered by FERS including transfers and new hires.[2]

## FERS Implementation

The agencies principally involved in the implementation of FERS were the Office of Personnel Management (OPM), which is responsible for administering the pension plan component of FERS and educating employees about the new system; the Social Security Administration (SSA), which assisted OPM in educating employees about Social Security and informing employees how much Social Security credit they had earned from previous employment; and the Federal Retirement Thrift Investment Board, established by the act to administer the thrift savings plan. In addition, the Pension and Welfare Benefits Administration of the Department of Labor has regulatory and enforcement authority

---

[1]OPM regulations allowed agencies to accept belated transfers to FERS for up to 6 months after the close of the open season. Transfers could be made if employees certified they did not receive the FERS transfer handbook or for other reasons, such as the employees being unaware of the impact of the public pension offset provisions of the Social Security amendments passed by Congress on December 22, 1987, just before the close of the open season.

[2]The FERS act also established slightly different pension plans for officers and employees of the Foreign Service and the Central Intelligence Agency. We did not examine the implementation of these plans.

SAPPX054
Pleading Number : 2017030184     Submission date : 2017-07-23 12:53:27     Confirmation Number: 1207307408     page 28 of 52

**Chapter 1**
**Introduction**

under the FERS act relating to the fiduciary responsibilities of the Thrift Board.

# Objective, Scope, and Methodology

The Chairman, House Committee on Post Office and Civil Service, requested that we assess the actions taken to implement the FERS act. Our objective was to determine how well the principal agencies carried out their responsibilities in implementing the new system. To do this, we (1) interviewed responsible officials at OPM, SSA, the Thrift Board, and the Department of Labor; (2) reviewed the agencies' implementation plans and procedures; and (3) monitored various activities of the agencies during the implementation period.

To determine what was done by other agencies to implement FERS, we visited the 23 Department of the Army and Veterans Administration field activities listed in the appendix of this report. We selected two large agencies, one military and one civilian. Both employ a large number of civilian employees and have numerous field activities widely dispersed throughout the country. However, because we did not randomly select the two agencies or their field locations, the information obtained cannot be projected to portray the implementation of FERS throughout the Army, Veterans Administration, or the government.

At the field activities, we interviewed officials who were responsible for implementing the new retirement system and employees who were designated as "decision advisors" and trained to assist other employees in deciding whether to transfer to FERS. We ascertained what information was provided to employees at those locations, the availability of decision advisors for counseling sessions, and the type of training given to the advisors.

Our work was done in accordance with generally accepted government auditing standards between February 1987 and March 1988. The views of responsible agency officials were sought during the course of our work and are incorporated where appropriate. OPM, Thrift Board, and Labor officials informally reviewed the report and agreed with the information presented.

SAPPX055

Chapter 2

# Implementation of the Pension Plan

The act required OPM to begin administering the FERS pension plan by January 1, 1987. Accordingly, OPM issued information on policies and procedures necessary for the pension plan to begin operating on that date and for employees in other systems to transfer to FERS at their election. It developed and provided a substantial amount of information to assist employees who were eligible to transfer to FERS. As required by the act, OPM also developed a training program for agencies' retirement counselors so they could provide employees up-to-date information and is taking steps to automate FERS pension plan records. Overall, we believe OPM carried out its responsibilities well in implementing FERS within the legislated time frames.

SSA provided technical support to OPM and provided over 950,000 federal employees with Social Security earnings and coverage information for use in making their transfer decisions.

## OPM Established the New Pension Plan and Provided Guidance to Agencies

The act made OPM responsible for administering the pension plan and coordinating implementation requirements with agencies. Because the act created a completely new retirement system, OPM was required to advise agency personnel and payroll offices of the provisions of the legislation and to develop regulations, guidelines, and forms for agencies to use in administering FERS. OPM began issuing information on new policies and procedures shortly after the act was signed and continued to issue clarifying policy and procedural guidance until the plan was implemented.

An OPM official estimated about 2.1 million federal civilian employees covered by CSRS were eligible to transfer to FERS during the open season. OPM developed the following materials and guidance to assist employees in understanding the differences between the two systems:

- FERS pamphlet - The pamphlet gave an overview of FERS, described the transfer eligibility requirements, and provided illustrations of benefits available to employees from each system. According to OPM, the pamphlet was distributed to federal agencies in September 1986.
- FERS Transfer Handbook (A Guide to Making Your Decision) - The handbook was a comprehensive explanation of the various CSRS and FERS features. OPM instructed agencies to provide the handbook to all employees eligible to transfer to FERS and requested that it be distributed in June 1987, just prior to the open season. OPM believed the handbook contained all the necessary information to make a transfer decision. The handbook was 124 pages long and described in detail the key provisions of FERS,

SAPPX056

**Chapter 2**
**Implementation of the Pension Plan**

including the benefits available from the pension plan, Social Security, and the thrift plan. An appendix to the handbook enabled employees to estimate the retirement benefits they could receive under each system. An audio tape covering the same information was made available for the visually impaired.

- Decision advisor training - OPM designed and conducted a 4-day training course for employees selected by their agencies to assist other employees in making transfer decisions. These employees, designated as "decision advisors," were expected to (1) have a good understanding of the provisions of FERS and CSRS, (2) make presentations to groups of coworkers, and (3) assist individual employees in making comparative benefit calculations and transfer decisions. Decision advisors were directed to refrain from recommending the decisions employees should make.

- Computer model - OPM adapted a computer model initially developed by the Congressional Research Service that made comparative estimates of benefits available from CSRS and FERS. OPM officials said they believed employees should make transfer decisions on the basis of which retirement system better fit their personal situations and that the benefit estimates available from the model could be helpful to them. The model allowed employees to estimate benefits from the two systems at various retirement ages, salary levels, years of service, and thrift plan contribution levels.

OPM also made the following videos available:

Today's News - This 20-minute orientation video was presented in an evening news format and highlighted the provisions and benefits under FERS and CSRS. A closed caption version was also made available for the hearing impaired.

Today's News - Special Edition - This 60-minute video, which also had a closed caption version for the hearing impaired, was in a news magazine format. The video identified the differences between FERS and CSRS and illustrated career plans and circumstances that could cause hypothetical federal employees to choose to stay in CSRS or transfer to FERS. OPM suggested agencies show the video during employee briefings and orientation sessions. It also encouraged public service television stations to broadcast the video.

# Automation of FERS Pension Plan Records

In September 1987, OPM contracted for the development of an automated system for FERS pension plan records. An OPM official said a fully automated system would enable OPM to handle FERS records more efficiently

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 31 of 52

Chapter 2
Implementation of the Pension Plan

than the predominately manual system used for CSRS records and that an automated system should be implemented while the volume of FERS records is relatively low. Implementation of the automated system is planned for October 1991. Until that time, FERS records are being handled in the same manner as CSRS records. Because of the large number of CSRS records on file and the time-consuming process of converting records to a computer-readable format, OPM doubted if CSRS records will ever be fully automated.

## Retirement Counselor Training

The FERS act required OPM to provide annual training to employees responsible for retirement counseling in federal agencies. As a first step in carrying out this requirement, OPM asked each agency to establish a new Retirement Counselor position at the headquarters level. Because of the complexity of the retirement systems, OPM suggested that the position be created at a level reporting directly to the Personnel Director and that agency heads give careful consideration in appointing individuals to this position.

In 1987 OPM met the annual training requirement by designing and presenting the decision advisor training. In 1988, the training requirement is being met by requiring agency Retirement Counselors to attend sessions of OPM's Interagency Advisory Group Committee of Retirement Counselors. The Committee is made up of OPM officials and about 100 agency Retirement Counselors who meet at least bimonthly to discuss personnel policies, programs, and problems affecting retirement matters. As of May 1988, the Committee had met four times (December 1987 and February, April, and May 1988). As a result of Committee discussions, OPM is developing training courses for agency employees in headquarters and field units who are providing individual retirement counseling, processing retirement applications, and performing retirement related payroll functions.

In addition to the training sessions, OPM officials told us they have improved communications with agencies by creating Retirement Counselor Letters—a series of letters to retirement counselors alerting them to proposed retirement changes or seeking their opinions on various proposals. In addition, OPM is developing a Retirement Counselor Manual. OPM said these documents will be used to keep retirement counselors up-to-date on any matters dealing with retirement, and the retirement counselors will be responsible for informing all headquarters and field retirement officers in their agencies of these matters.

SAPPX058
Pleading Number : 2017030184     Submission date : 2017-07-23 12:53:27     Confirmation Number: 1207307408     page 32 of 52

## SSA Implementation Activities

SSA was responsible for providing Social Security earnings and coverage data to federal employees so they could more completely assess the benefits of transferring to FERS. SSA also provided technical assistance to OPM in developing the FERS handbook and materials used by decision advisors and by participating in some FERS briefings at agencies.

SSA anticipated that it could receive requests for information from as many as 1.6 million employees, which would overwhelm its system for handling inquiries for earnings and coverage information. Therefore, SSA contracted with a private firm to design and process information requests using a fully automated system and machine-readable forms. OPM reimbursed SSA $500,000 for the costs of developing the system and processing the requests.

SSA gave agencies the options of distributing the machine-readable forms to all employees or distributing them on a request basis. To help limit inquiries to employees who were actually considering transferring to FERS, SSA urged agencies to use the latter option. One agency—the U.S. Postal Service—did not use either option. It requested SSA to provide earnings and coverage information for all its employees.

From May to December 1987, SSA processed about 950,000 requests, including about 540,000 requests from the Postal Service.

Pleading Number : 2017030184    Submission date : 2017-07-23 12:53:27    Confirmation Number: 1207307408    page 33 of 52

Chapter 3

# Implementation of the Thrift Savings Plan

The FERS act created the Federal Retirement Thrift Investment Board as an independent agency responsible for administering the thrift savings plan. The President appointed the Board members about 4 months after the act was passed. Because of this delay, the Board had to implement the plan in less than 6 months to have it operational by April 1, 1987. Considering this short time frame and the tasks involved in establishing a new agency and a new plan, we believe the Thrift Board has carried out its responsibilities well.

The Board experienced delays in distributing brochures and employee enrollment forms to the agencies before the first open season began. In addition, some agency payroll offices did not modify their payroll procedures or submit payroll tapes to the Board's record keeper within designated time frames, resulting in some participants permanently losing interest earnings on their initial contributions. Loan disbursements were delayed until at least March 1988 because agencies could not establish loan repayment procedures using direct deposit/electronic fund transfers as the Board required. Until repayment mechanisms are in place, the Thrift Board is allowing agencies to process loan repayments with journal vouchers.

As of May 1988, over 1 million federal employees had thrift savings accounts with a total value of over $1.6 billion. At that time, 45 percent of the eligible employees covered by FERS were contributing to the thrift plan (all eligible FERS-covered employees receive agency contributions), and about 20 percent of the CSRS-covered employees were contributing.

## Thrift Investment Board

The FERS act required that the thrift plan be managed by five Board members appointed by the President and an Executive Director appointed by the Board. All of these individuals were required to have training and expertise in the management of financial investments and pension benefit plans. The Board establishes investment policy and oversees investment performance and plan administration. The act required the Chairman of the Board to appoint a 14-member Employee Thrift Advisory Council to advise the Board and Executive Director on investment and administrative policies. The Executive Director manages the day-to-day operations of the plan.

Although the FERS act authorized the establishment of the Thrift Board in June 1986, the President did not appoint the Board members until

SAPPX060

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 34 of 52

October 1, 1986. The Board subsequently appointed an Executive Director who assumed his duties on November 1, 1986. Notwithstanding these delays, by April 1, 1987, the Thrift Board had

- developed policies and procedures for implementing the thrift plan;
- designed and implemented an accounting system;
- disseminated thrift plan brochures and election and beneficiary forms to all federal agencies; and
- established accounts for approximately 600,000 employees covered by FERS who were hired before January 1987.

## Thrift Savings Plan

The thrift savings plan provides employees income tax deferral on their contributions, agency contributions, and investment earnings. All eligible FERS employees receive an automatic agency contribution of 1 percent of their basic salary each pay period into their thrift plan accounts whether or not they contribute to the plan themselves.[1] FERS employees may contribute up to 10 percent of their basic salary each pay period. Agencies match employee contributions dollar-for-dollar for the first 3 percent of pay and 50 cents on the dollar for the next 2 percent. Agencies do not match employee contributions greater than 5 percent of pay. Employees covered by CSRS may participate in the thrift plan, but they do not receive government contributions and may only contribute up to 5 percent of pay.

The thrift savings plan is a long-term savings plan designed to provide retirement income. Therefore, federal employees may not obtain funds from their accounts before retirement except through a loan program. Employees leaving the federal government before retirement eligibility may transfer vested account balances to an Individual Retirement Account or eligible retirement plan, or they may defer payments until they are eligible to retire. At retirement, they may (1) receive a lump-sum payment, (2) withdraw the account balance in equal installments, or (3) receive an immediate or deferred life annuity based on the balance in the account.

In April 1987, the Thrift Board deposited approximately $150 million in the accounts of about 600,000 employees who entered the government

---

[1]Newly hired federal employees are generally required to wait between 6 months and 1 year before they are eligible to participate in the thrift plan and/or receive agency contributions. Employees hired between January and June of any year begin receiving the 1 percent agency contribution the first full pay period of the following January, and those hired between July and December of the year begin receiving the 1-percent contribution the first full pay period of the following July.

SAPPX061
Pleading Number : 2017030184    Submission date : 2017-07-23 12:53:27    Confirmation Number: 1207307408    page 35 of 52

Chapter 3
Implementation of the Thrift Savings Plan

between January 1, 1984, and December 31, 1986. This represented a one-time congressional appropriation of 1 percent of the employees' salaries plus interest for that period. A separate retroactive contribution of approximately $30 million from agency budgets was also deposited into employees' accounts to cover 1 percent of their salaries, plus interest, for the period January 1, 1987, the original planned start of the plan, through April 1, 1987, when the thrift plan actually became operational.

## Investment Options

During 1987, all employee and agency contributions in the thrift plan were required by the FERS act to be invested solely in nonmarketable securities issued by the U.S. Treasury, called the G fund.

Beginning in January 1988, the act permitted FERS employees to invest a portion of their contributions (and beginning in 1993, a portion of their agencies' contributions) in two additional investment options—a common stock index investment fund (C fund) and a fixed income index investment fund (F fund). The C fund will be invested proportionately in all of the common stocks included in Standard & Poor's 500 Stock Index (except for stock of the Wells Fargo Company, the manager of the C fund) and is intended to replicate the performance of that index. The F fund is a bond index fund designed to duplicate the performance of the Shearson Lehman Hutton Government/Corporate Bond Index and consists of a representative selection of U.S. Treasury, federal agency, and corporate notes and bonds included in the overall index. Investments in the C and F funds involve greater risk than the G fund but also provide an opportunity for participants to receive higher rates of return. Thrift plan participants covered by CSRS may invest only in the G fund.

As of May 1988, about 22,400 FERS employees had invested about $1.25 million in the C fund and about $875,000 in the F fund.

## Open Seasons

As required by the act, the thrift plan is to have two open seasons annually during which eligible employees can join the plan, change their contribution rate, or modify their investment mix. Employees are allowed to terminate thrift plan participation at any time. In 1987, the first open season was February 15 to April 30, and the second was May 15 to July 31. For 1988, the first open season was November 15, 1987, to January 31, 1988; and the second was May 15 to July 31, 1988. Before the start of each open season, the Board distributed updated thrift plan booklets to all federal agencies for dissemination to their employees and plans to

SAPPX062

Pleading Number : 2017030184    Submission date : 2017-07-23 12:53:27    Confirmation Number: 1207307408    page 36 of 52

Chapter 3
Implementation of the Thrift Savings Plan

continue this practice in the future. Every 6 months the Board also distributes employee account statements that show ending balances and transactions processed during the statement period.

## Start-Up Problems

Although the thrift plan had some start-up problems, many of the problems occurred because each of the plan's programs and operations needed to be coordinated with over 600 agency payroll offices. The Thrift Board believes the problems were not serious or unexpected, especially in view of the large number of agencies and employees that needed to be served and the limited amount of time the Board and agencies had to implement the plan.

## Special Catch-Up Benefits

The FERS act required the thrift plan to begin operating on January 1, 1987. However, because of the delays in appointing the Board and the Executive Director, the act was amended to start plan operations on April 1, 1987. To compensate employees for the late start and the lost opportunity to make contributions, the amendment increased the maximum employee contribution rate and matching agency contributions on a one-time-only basis. From April 1 through September 30, 1987, FERS employees were able to contribute up to a maximum of 15 percent of their basic pay. For April, May, and June 1987, agencies contributed 2 dollars for every 1 dollar of FERS employees' contributions, up to 3 percent of pay, and matched dollar-for-dollar the next 2 percent. Employees covered by CSRS were allowed to contribute up to 7.5 percent of their pay from April through September 1987.

## Distribution of Some Thrift Plan Booklets and Forms Delayed

The first open season was February 15 to April 30, 1987, but because of printing and shipping problems, the thrift plan booklets and enrollment forms were generally not available to employees by February 15. According to a Thrift Board official, the majority of booklets arrived at agency receiving points by the third week of February, and the last of the enrollment forms went to the agencies the second week of March. After receipt, agencies were responsible for distributing the booklets and forms to their employees. The Executive Director of the Thrift Board said that through mid-April the Board continued to receive complaints from employees that they had not received the booklets or enrollment forms from their agencies, but he said that this was no longer a problem. In mid-April we conducted a limited survey of 22 federal installations throughout the country and identified that booklets and

SAPPX063
Pleading Number : 2017030184      Submission date : 2017-07-23 12:53:27      Confirmation Number: 1207307408      page 37 of 52

forms had been distributed to employees or were available to employees at their personnel offices.

## Tape Submission Delays Caused Employees to Lose Earnings on Contributions

On November 21, 1986, the Thrift Board entered into an agreement with the Department of Agriculture's National Finance Center to develop and maintain the records on employee thrift plan accounts. The Board and Finance Center worked with agencies' payroll offices to establish procedures for submitting computer tapes showing participants' and agencies' contributions. Because there is no unified payroll system in the federal government, 602 payroll reporting offices located throughout the world were involved.

Between April and June 1987, some employees lost interest on their thrift account contributions because their agencies were delinquent in submitting accurate payroll tapes to the Thrift Board. While Board officials were unable to estimate how many participants were affected or how much interest was lost, they concluded the loss was minimal. They cited a Department of Health and Human Services estimate that each of its participants lost between 55 and 60 cents interest on their contributions because payroll tapes were submitted late during April 1987. In general, we found that employees lost 1-month's interest on their contributions for the month of April 1987.

Because of these delays, Congress amended the FERS act, effective January 8, 1988, to require agencies to submit payroll tapes no later than 12 days after the end of each pay period. The act previously required agencies to submit payroll tapes "at the end of the pay period."

## Late Start for Loan Program

As authorized by the act, beginning in 1988 thrift plan participants who accumulate at least $1,000 of their own contributions and associated earnings in their accounts may apply for loans to use toward the purchase of a primary residence, meet educational or medical expenses, or offset financial hardship. Loans are provided to employees at the interest rate being earned by the G fund during the month the loan application was requested. Employees obtain loans from and make repayments to their own accounts. The Board distributed loan applications and booklets to agencies between December 1987 and January 22, 1988, and the first loans were disbursed to employees in March 1988.

Loan disbursements are made once a month following the allocation of earnings to participants' accounts. As of mid-May 1988, 904 loans had

SAPPX064

been disbursed to participants (94 in March, 287 in April, and 523 in May) for a total of $1,184,466 for the 3-month period.

Some employees were unable to get loans during March and April 1988 because their agency payroll offices did not have acceptable loan repayment mechanisms in place. Except for prepayments in full, the Thrift Board requires loan repayments to be made through payroll allotments. The allotment procedure preferred by the Thrift Board is direct deposit/ electronic fund transfer when the payroll offices are in the continental United States. Payroll offices outside the continental United States may issue checks for employee loan repayments.

In March and April 1988, in response to a Thrift Board survey, 260 payroll offices reported that they could process loan repayments using the direct deposit/electronic fund transfer mechanism. These offices covered about 56 percent of all employees with thrift accounts. An additional 78 payroll offices, covering 13 percent of employees with thrift accounts, expected to have repayment processes in place by June 1988. Twenty-one payroll offices, serving about 16 percent of employees with thrift accounts, expected to have acceptable repayment processes in place by September 1988. The remaining payroll offices either did not estimate when they would be ready to process loan repayments using direct deposit/electronic fund transfers or estimated they would not be ready until after September 1988.

The Thrift Board had not contemplated that payroll offices would lack the capability to make repayments through discretionary allotments using direct deposit/electronic fund transfers. However, in order to accommodate employees in those agencies, the Thrift Board authorized the use of an interim manual loan repayment process using manual journal vouchers until the agencies could establish a direct deposit/electronic fund transfer discretionary allotment capability. By mid-May 1988, the Thrift Board had disbursed all approved loans because employees' payroll offices had either established the preferred repayment procedures or agreed to the interim manual procedures.

## Monitoring the Responsibilities of Thrift Board Fiduciaries

As fiduciaries of the thrift savings plan, the five Board members and the Executive Director are required to act solely in the interest of thrift plan participants and beneficiaries and will be held liable for any inappropriate actions. Under the Employee Retirement Income Security Act of 1974, the Department of Labor is responsible for, among other things, the administration and enforcement of fiduciary standards for private

SAPPX065
Pleading Number : 2017030184    Submission date : 2017-07-23 12:53:27    Confirmation Number: 1207307408    page 39 of 52

sector employee benefit plans.[2] The FERS act gave the Department similar responsibilities for the thrift savings plan.

According to Department officials, their activities involving the Thrift Board during 1987 included identifying and assessing the Board's fiduciary responsibilities and contracting with two private accounting firms to develop an audit program to review the Board's compliance with the fiduciary requirements. During 1988, the Department plans to write regulations and develop milestones for specific projects, such as the adoption of final bonding rules for Thrift Board members. During the summer of 1988, one contractor will begin auditing payroll offices with high participation levels. In the fall, the other contractor will begin auditing the Thrift Board's compliance with fiduciary requirements. As of May 1988, no allegations of Board member or Executive Director misconduct had been made by, or brought to the attention of, the Department of Labor's enforcement unit.

[2]Department of Labor officials said the agency is responsible for oversight of financial institutions and other organizations that manage private pension, health, and dental plans. The Department makes approximately 1,700 investigations a year. These were initiated through referrals from employees, lawyers, Members of Congress, and anonymous tipsters and through auditing bank accounts with substantial amounts of benefit plan funds.

SAPPX066
Pleading Number : 2017030184     Submission date : 2017-07-23 12:53:27     Confirmation Number: 1207307408     page 40 of 52

Chapter 4

# FERS Open Season Implementation at Selected Army and VA Facilities

In October 1987, we visited 12 Army and 11 VA facilities to determine how they implemented the open season when CSRS-covered employees could transfer to FERS. We found that these installations generally followed OPM's suggested approach for implementing FERS and provided employees with FERS information and numerous opportunities to obtain further details about FERS. Most employees did not attend available training sessions.

For budgeting and planning purposes, the Office of Management and Budget estimated that as many as 40 percent of eligible employees would transfer to FERS. In January 1988, OPM requested agency retirement counselors to identify the number of employees who transferred to FERS during the open season. Their responses indicated that about 56,900 employees transferred from CSRS to FERS, or about 2.8 percent of all employees who were eligible. The transfer rate at Army and VA facilities we visited varied from 0.7 percent to 4.2 percent of eligible employees. (See the app. for the transfer rate for each facility.) While fewer CSRS employees than expected transferred to FERS, we found no underlying deficiencies in the implementation of the transfer program.

## Distribution of FERS Information

All of the facilities distributed the FERS transfer handbook, which outlined the basic features of CSRS and FERS, to employees during the period May to July 1987. In addition, 22 of the 23 facilities distributed the 21-page FERS pamphlet to their employees between November 1986 and June 1987. An official at the VA Regional Office in Washington, D.C., said pamphlets were not distributed because they were not received from VA headquarters.

Officials at 10 of the 23 facilities we visited said they provided all employees the Social Security earnings request form to obtain Social Security earnings and coverage data. The remaining 13 facilities said they followed SSA's suggestion and provided forms to employees upon request.

## Decision Advisors Were Trained and Available to Assist Employees

An April 28, 1987, OPM memorandum to agencies' personnel directors emphasized that FERS decision advisors were critical to an effective open season and included a suggested employee memorandum identifying the decision advisors at agency facilities. OPM said the decision advisors were responsible for assisting employees in making their decisions by answering questions, conducting briefings and individual counseling sessions, making comparative benefit estimates with the computer model,

SAPPX067

and assisting employees in analyzing the results. A March 6, 1987, OPM memorandum said that agencies should designate 1 decision advisor for every 500 employees.

A total of 317 decision advisors were designated to cover about 78,000 employees located at the 23 facilities we visited. According to officials at the facilities, about 76 percent (241 of 317) of the decision advisors attended the OPM decision advisor training course. Most of the remaining decision advisors attended informal training sessions conducted by employees who attended the OPM course or attended training courses offered by private contractors.

## Briefings Were Available but Not Well Attended

All facilities offered employees opportunities to attend briefings conducted by the decision advisors in order to become better informed about FERS and CSRS. While briefings varied at facilities, we were told that most included the viewing of the OPM videos or slides made locally, and a question and answer session. Some facilities also presented the videos and briefings in separate sessions.

Agency officials at 18 of the 23 facilities we visited estimated that fewer than 50 percent of the eligible employees attended briefing sessions. The attendance percentages at the 18 facilities ranged from 48 percent at a Fort Worth, Texas, Army facility to about 2 percent at the Fort Meade, Maryland, Army facility. At the remaining five facilities, four had more than 50 percent attend the briefing sessions, and one did not have specific attendance information.

Some facilities offered numerous briefings but also did not have large attendance rates. For example, the Washington, D.C., VA facility offered 39 briefing sessions with total attendance of about 14 percent (208 of the 1,517 eligible employees).

## Computer Model Estimates Were Generally Available

Although the number of employees who obtained computer model estimates varied widely at the facilities we visited, personnel officials said all employees requesting estimates received them except employees at the San Francisco VA Medical Center. An official at this facility believed the computer program was inaccurate and would not allow the analyses to be prepared for employees. However, the official made copies of the program available to employees so they could develop their own analyses. The highest percentage of employees receiving estimates was at the Fort Worth, Texas, Army facility where 80 percent (1,680 of 2,100) of

SAPPX068

the eligible employees received them by August 1987. Other facilities had much lower rates: 49 of the 1,507 eligible employees (3 percent) at the Palo Alto, California, VA Medical Center received estimates; and 40 of about 5,000 eligible employees (1 percent) received estimates at the Army's Fort Meade, Maryland, facility. At the Waco, Texas, VA medical facility, the only notice that a computer estimate was available was provided during briefings attended by 160 of the Center's 1,038 eligible employees; only 5 had received estimates at that location as of late October 1987.

## Individual Counseling Sessions Were Available

Decision advisors were available at most facilities to provide individual counseling sessions to assist employees. At these sessions, employees had the opportunity to obtain answers to any questions they had after reading the OPM material or attending briefings. The individual sessions offered a climate of confidentiality, which some employees desired. Computer analyses were sometimes done at these sessions, but usually they were done by decision advisors in advance so that results could be discussed at the sessions.

## Views on Why More Employees Did Not Transfer to FERS

As part of our review, we obtained information from officials at 11 Department of the Army and 10 Veterans Administration facilities about agency efforts to assist employees in making their decisions on whether to remain in CSRS or transfer to FERS. In October 1987, we interviewed 46 decision advisors or personnel officials at these locations who were involved in the FERS implementation process. These officials provided their views on why employees did not transfer to FERS. The major reasons officials identified and the number of times these reasons were cited are as follows:[1]

- Employees planned to make the federal government a career and believed CSRS provided greater benefits for career employees than FERS. Thirty-two officials cited this reason.
- Lack of trust in some aspect of the design or stability of FERS was cited by 25 officials. These aspects include: the viability of the social security system, which is a component of FERS (cited 15 times); future changes by the Administration (cited 13 times); future changes by Congress in the

---

[1]These views were previously reported in our report FEDERAL PERSONNEL: Views From Two Agencies on Why More Employees Did Not Join the New Retirement System (GAO-GGD-88-52FS, Mar. 1988).

SAPPX069

**Chapter 4**
**FERS Open Season Implementation at**
**Selected Army and VA Facilities**

present design of FERS (cited 9 times); and the permanency of FERS bene-
fits (cited 2 times). Some officials cited more than one aspect.

- Employees could not afford to contribute to the thrift plan component of
  FERS. Twenty-two officials cited this reason.
- Employees were waiting for Congress to act on proposals to change the
  FERS provisions, a reason cited by 13 officials. The provisions most fre-
  quently mentioned in this respect were those relating to ''windfall''
  Social Security benefits, eligibility of FERS participants for Social Secur-
  ity spousal and survivor benefits, and/or discrimination tests on higher
  paid employees' contributions to the thrift plan.
- FERS is too complex for employees to understand. This reason was cited
  by 10 officials.

SAPPX070

Pleading Number : 2017030184          Submission date : 2017-07-23 12:53:27          Confirmation Number: 1207307408          page 44 of 52

SAPPX071

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 45 of 52

Appendix

# Transfer Rates at Army and VA Facilities Included in GAO Review

| Agency | Facility | Transfer rate |
|--------|----------|---------------|
| Army | Aberdeen Proving Grounds, MD | 2.1 |
| | Corps of Engineers Headquarters, Washington, DC | 1.9 |
| | Fort Belvoir, VA | 1.6 |
| | Fort Benning Infantry Center, GA | 3.8 |
| | Fort Gordon, Augusta, GA | 2.2 |
| | Fort Meade, VA | 2.0 |
| | Fort Worth Army Engineering, TX | 4.1 |
| | Hoffman Building, Alexandria, VA | 1.0 |
| | Pentagon, Arlington, VA | 1.2 |
| | Presidio of San Francisco, CA | 2.0 |
| | Red River Army Depot, Texarkana, TX | 0.7 |
| | Sacramento Army Depot, CA | 1.5 |
| Veterans Administration | Augusta Medical Center, GA | 1.9 |
| | Dallas Medical Center, TX | 1.8 |
| | Martinsburg Medical Center, WV | 2.9 |
| | Palo Alto Medical Center, CA | 4.2 |
| | Perry Point Medical Center, MD | 1.5 |
| | Richmond Medical Center, VA | 4.0 |
| | San Francisco Medical Center, CA | 1.8 |
| | Tuskegee Medical Center, AL | 2.0 |
| | Waco Medical Center, TX | 1.1 |
| | Washington, DC, Benefits Office | 1.8 |
| | Washington, DC, Medical Center | 2.4 |

SAPPX072

Pleading Number : 2017030184        Submission date : 2017-07-23 12:53:27        Confirmation Number: 1207307408        page 46 of 52

Pleading Number : 2017030184          Submission date : 2017-07-23 12:53:27          Confirmation Number: 1207307408          page 47 of 52

Requests for copies of GAO reports should be sent to:

U.S. General Accounting Office
Post Office Box 6015
Gaithersburg, Maryland 20877

Telephone 202-275-6241

The first five copies of each report are free. Additional copies are $2.00 each.

There is a 25% discount on orders for 100 or more copies mailed to a single address.

Orders must be prepaid by cash or by check or money order made out to the Superintendent of Documents.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

【 B-158844 】

**Appointments—Acceptance Requirement—Holiday Prior to First Workday**

An appointment alone not establishing an employment relationship, the entitlement of a new appointee to compensation for a holiday on which no service is performed dependent on whether at the time of the holiday the appointee holds a position with the United States requires acceptance of the appointment by verbal affirmation, taking the oath of office, assumption of the duties of the position, or by some other overt act; therefore, under appointments effective Sunday, the day preceding a holiday, appointees who do not report for duty or take the oath of office until the Tuesday following the holiday may be paid for the holiday if evidence establishes the actual acceptance of the appointment, either verbally or otherwise on Sunday, notwithstanding the employee did not take the oath of office and report for duty until Tuesday.

**To the Administrator, Federal Aviation Agency, April 28, 1966:**

On March 30, 1966, you requested our decision concerning the authority for an appointing official of your Agency to suspend the pay status of new appointees until the Tuesday following a Monday holiday in cases where such employees have been appointed to the positions effective Sunday, the day preceding the holiday, but did not report for duty or take the oath of office until the Tuesday following the Monday holiday.

The entitlement of a new appointee (under the circumstances related above) to pay for a holiday on which he performs no service is dependent, in the first instance, upon whether at the time of the occurrence of such holiday he in fact holds a position under the United States. The appointment alone does not vest him with the position. Before an employment relationship is established there must have been an acceptance of the appointment. The acceptance may be made by verbal affirmation; taking the oath of office; assumption of the duties of the position or by some other overt act.

While the first paragraph of your letter says the employees indicated their acceptance of the appointment on Sunday, the manner of such acceptance is not specified.

If in fact there is evidence which establishes that any particular employee actually accepted the tendered appointment, either verbally or otherwise on Sunday, then he would be entitled to pay for the Monday holiday notwithstanding that he did not take the oath of office and report for duty until Tuesday and there would be no administrative discretion to deny him pay for the Monday.

# Certificate Of Service

e-Appeal has handled service of the assembled pleading to MSPB and all of the Parties. Following is the list of the Parties in the case:

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Office of the Clerk of the Board | Motion for Leave to File Supplemental Evidence to be considered in PFR | e-Appeal / e-Mail |
| James P. Burke<br>Agency Representative | Motion for Leave to File Supplemental Evidence to be considered in PFR | e-Appeal / e-Mail |
| James Jackson<br>Agency Representative | Motion for Leave to File Supplemental Evidence to be considered in PFR | e-Appeal / e-Mail |



# U.S. MERIT SYSTEMS PROTECTION BOARD

### Office of the Clerk of the Board

**1615 M Street, N.W.**
**Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

**July 24, 2017**

Notice to:

Mary Ann L. Globokar
20265 Bradgate Lane
Strongsville, OH 44149

> Re: Mary Ann L. Globokar v. National Aeronautics and Space Admin
> MSPB Docket Number: CH-0839-16-0596-I-1

    The Board has received your filing dated <u>July 23, 2017</u> in which you request leave to file additional pleadings and include with your motion a copy of the additional pleadings. The Board's regulations do not provide for pleadings other than a petition for review, a cross petition for review, a response to the petition for review or cross petition for review, and a reply to a response. <u>5 C.F.R. § 1201.114</u> (a)(5). A description of these pleadings and the time limits for filing them are set forth in the Board's regulations. <u>5 C.F.R. § 1201.114</u>(a), (e). For the Board to consider a party's pleading, other than one of those set forth above, the party must describe the nature and need for the pleading. <u>5 C.F.R. § 1201.114</u>(a)(5). If a party wishes to submit a pleading after the record has closed, the party must also show that the evidence was not readily available before the record closed. <u>5 C.F.R. § 1201.114</u>(a)(5), (k).

    Your combined motion and additional pleading have been deleted from the e-Appeal Repository and will be returned to you via separate email. You may resubmit your motion to submit an additional pleading by <u>briefly</u> describing the nature and need for the pleading and showing that the evidence was not readily available before the record closed. <u>5 C.F.R. § 1201.114</u>(a)(5), (k). <u>Please do not include your additional pleading with your motion</u>. If you choose to resubmit your motion, you will be informed at a later date of the Board's decision to grant or deny your request. If the Board grants your request, you will be given 10 days in which to resubmit your additional pleading to the Board. For more information about the Board's petition for review process, please review the Board's regulations at <u>5 C.F.R. § 1201.114 - 1201.120</u>.

Jennifer Everling
Acting Clerk of the Board


_____

Crystal Q. Wilson
Paralegal Specialist

CERTIFICATE OF SERVICE

      I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Mail         Mary Ann L.  Globokar
                             20265 Bradgate Lane
                             Strongsville, OH 44149

<u>Agency Representative</u>

Electronic Mail         James Jackson
                             National Aeronautics and Space Admin
                             21000 Brookpark Road
                             Mail Stop 142-7

                             Cleveland, OH 44135

Electronic Mail         James P. Burke
                             National Aeronautics and Space Admin
                             NASA Glenn Research Center
                             Office of the Chief Counsel - Code G
                             21000 Brookpark Road, M.S. 142-7
                             Cleveland, OH 44135

      July 24, 2017
_____        _____
         (Date)                        Crystal Q. Wilson
                                              Paralegal Specialist

1

BEFORE THE UNITED STATES
MERIT SYSTEMS PROTECTION BOARD
CENTRAL REGIONAL OFFICE

| | | |
|---|---|---|
| MARY ANN L. GLOBOKAR, | ) | Docket No.:  CH-0839-16-0596-I-1 |
| | ) | |
| Appellant, pro se | ) | |
| | ) | Administrative Judge |
| v. | ) | Georgia Vlahos |
| | ) | |
| NATIONAL AERONAUTICS AND | ) | |
| SPACE ADMINISTRATION, | ) | |
| | ) | |
| Agency. | ) | DATE:  July 24, 2017 |

APPELLANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE

Appellant hereby respectfully files this motion for leave on July 24, 2017 to file

supplemental evidence to be considered by the MSPB Board regarding Appellant's

*Petition for Review* (acknowledged March 3, 2017) to determine if Appellant is entitled

to corrective action under FERCCA for being placed in the CSRS retirement system.

Good cause supports this motion, as additional material evidence was not readily

available nor presented prior to the close of record, as a consequence of detrimental

reliance on failed legal counsel.

RATIONALE FOR ALLOWING SUPPLEMENTAL EVIDENCE

Appellant, in good faith, relied on legal counsel to file a pleading on her behalf

appealing Agency decision of not being allowed retirement correction under FERCCA

legislation.  Appellant retained legal representation from Tully Rinckey, PLLC (TR-

1

PLLC), and depended upon the guidance and expertise of the representative assigned by the law firm, to her detriment.

Appellant initiated her pleading on September 16, 2016 with legal representation retained from TR-PLLC. Appellant was given verbal assurances from TR-PLLC associates, and in also in writing with a letter from TR-PLLC, stating their dedication to providing superior service "throughout the process until the legal matter has been resolved". On December 7, 2016, two days prior to Appellant's brief submission deadline, the TR-PLLC attorney contacted Appellant via telephone and advised Appellant to "not" file the brief. Appellant stated her wishes to continue with filing the brief, and the next day, December 8, 2016, the attorney removed himself as representative, leaving the Appellant with less than 48 hours to submit her brief on December 9, 2017. Appellant sought and was granted a one-week extension to prepare her brief, and filed her brief, pro se, by new approved deadline of December 16, 2016.

The TR-LLC legal attorney was derelict and negligent in the performance of his duties to advise and represent the Appellant, and did not follow through with due diligence into the research of Federal retirement legislation pertaining to Appellant's case. He had filed a one-week extension, solely based on his personal reasons, and then three (3) business days into that one-week extension, he verbally advised Appellant not to file. Attorney refused to proceed with filing Appellant's brief, in good faith as promised by TR-LLC, and stated he withdrew from the case at Appellant's direction. He repeatedly and persistently suggested that Appellant not dial in for the *Preliminary Status Order* held October 13, 2016. Appellant dialed in, despite the attorney's insistence not

to, and during the phone conference, the TR-LLC attorney conferred that a hearing was not necessary for Appellant's case.  Appellant, afterwards, questioned and challenged this "decision" to waive her right to a hearing, and the attorney emphatically coerced Appellant that a hearing was not necessary and that it would not look good for the record if Appellant chose to alter the *Preliminary Status Order*.  He also had another associate call to convince Appellant of the same.

To summarize, here are Appellant's main reasons and justifications for her plea to the honorable court, for granting leave to file supplemental evidence:

1.  Attorney did not rightfully and ethically advise and represent Appellant in good faith.

2.  Attorney did not follow through with due diligence in researching and applying the appropriate legislations in support of Appellant's pleading.

3.  Attorney was derelict in his role, removing himself as representative due to his lack of preparation, negligence and his own reluctance to file Appellant's brief.

4.  Appellant relied upon legal representation from TR-LLC, to her detriment, and was left with short notice, to proceed pro se, to conduct her own research into the myriad of legislations affecting Appellant's pleading for rightful enrollment in the CSRS retirement system.


Appellant conducted her own research into the retirement and social security laws and the specifics to the Agency hiring process and procedures during the latter half of

3

SAPPX084

1983, during the time period of Appellant's application for employment to NASA.

Appellant recently found an additional document, which supports her claim for retirement reclassification allowed under FERCCA legislation, and wishes for it to be considered as part of the record. This evidence was not readily available, as legislation impacting Appellant's case was not recently determined, until researched and examined by the Appellant herself, when she had formerly relied on legal counsel, to her detriment, to perform on her behalf.  Appellant has explored and studied the legislation on her own, and found compelling evidence to prove her claim for being enrolled in CSRS; hence, to prove entitlement to corrective action for retirement reclassification as allowed under FERCCA legislation, which was specifically created to correct classification errors, due to various ambiguous and subtle misinterpretations, as in this case.

Wherefore, based on good cause, Appellant respectfully files this motion for leave to file supplemental evidence for consideration by the MSPB board during the *Petition for Review* process.

Respectfully Submitted,

_____
Mary Ann L. Globokar
Appellant, pro se
20265 Bradgate Lane
Strongsville, OH 44149
Phone: (440) 785-7689
maryglobokar@att.net

4

# Certificate Of Service

e-Appeal has handled service of the assembled pleading to MSPB and all of the Parties.
Following is the list of the Parties in the case:

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Office of the Clerk of the Board | Apellant's Motion for Leave to File Supplemental Evidence | e-Appeal / e-Mail |
| James P. Burke<br>Agency Representative | Apellant's Motion for Leave to File Supplemental Evidence | e-Appeal / e-Mail |
| James Jackson<br>Agency Representative | Apellant's Motion for Leave to File Supplemental Evidence | e-Appeal / e-Mail |

 **U.S. MERIT SYSTEMS PROTECTION BOARD**

Office of the Clerk of the Board
1615 M Street, N.W.
Washington, D.C. 20419-0002
Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

**July 25, 2017**

Notice to:

Mary Ann L. Globokar
20265 Bradgate Lane
Strongsville, OH 44149

      Re: Mary Ann L. Globokar v. National Aeronautics and Space Admin
         MSPB Docket Number: CH-0839-16-0596-I-1

The Board acknowledges your filing dated July 24, 2017, in which you request leave to file an additional pleading. The Board's regulations do not provide for pleadings other than a petition for review, a cross petition for review, a response to the petition for review or cross petition for review, and a reply to a response. 5 C.F.R. § 1201.114(a)(5). A description of these pleadings and the time limits for filing them are set forth in the Board's regulations. 5 C.F.R. § 1201.114(a), (e). For the Board to consider a party's pleading, other than one of those set forth above, the party must describe the nature and need for the pleading. 5 C.F.R. § 1201.114(a)(5). If a party wishes to submit a pleading after the record has closed, the party must also show that the evidence was not readily available before the record closed. 5 C.F.R. § 1201.114(a)(5), (k).

You will be informed at a later date of the Board's decision to grant or deny your request. If the Board grants your request, you will be given 10 days in which to submit your additional pleading to the Board. For more information about the Board's petition for review process, please review the Board's regulations at 5 C.F.R. § 1201.114 - 1201.120.

Jennifer Everling
Acting Clerk of the Board


_____

Crystal Q. Wilson
Paralegal Specialist

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Mail

Mary Ann L.  Globokar
20265 Bradgate Lane
Strongsville, OH 44149

<u>Agency Representative</u>

Electronic Mail

James Jackson
National Aeronautics and Space Admin
21000 Brookpark Road
Mail Stop 142-7

Cleveland, OH 44135

Electronic Mail

James P. Burke
National Aeronautics and Space Admin
NASA Glenn Research Center
Office of the Chief Counsel - Code G
21000 Brookpark Road, M.S. 142-7
Cleveland, OH 44135

| July 25, 2017 | | Crystal Q. Wilson |
| --- | --- | --- |
| (Date) | | Paralegal Specialist |

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**CENTRAL REGIONAL OFFICE**

| | |
|---|---|
| MARY ANN L.  GLOBOKAR,<br>                    Appellant, | DOCKET NUMBER<br>CH-0839-16-0596-I-1 |
|                v. | |
| NATIONAL AERONAUTICS AND<br>    SPACE ADMIN,<br>                    Agency. | DATE: December 8, 2016 |

**ORDER GRANTING APPELLANT'S REQUEST**
**FOR EXTENSION OF TIME**

By submission dated December 8, 2016, the appellant requested an extension of time to file a pleading responsive to the Revised Order Closing the Record, citing her attorney's withdrawal from representing her before the Board. I find that good cause exists for an extension of time.

Consequently, the appellant's request for an extension is granted, and accordingly, the time period for her to file argument and evidence in support of her request for corrective action under the Federal Erroneous Retirement Coverage Corrections Act, P.L. 106-265, Title III, 5 U.S.C. § 8331 Note and addressing the issues the agency has raised in its October 11, 2015 response **is extended to December 16, 2016**.

The agency's time period to reply to the appellant's submission is also extended to December 23, 2016, when the record will close. All evidence and argument must be filed by that date.  Evidence and related argument filed after that date will not be accepted unless the party submitting the evidence shows that it is new and material evidence that was not available before the record closed.  Notwithstanding the close of the record, however, pursuant to 5 C.F.R.

2

§ 1201.59(c), a party must be allowed to respond to new evidence or argument submitted by the other party just before the close of the record.


FOR THE BOARD:            _____/S/_____
                          Georgia Vlahos
                          Administrative Judge

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Mail        Mary Ann L.  Globokar
                       20265 Bradgate Lane
                       Strongsville, OH 44149

Agency Representative

Electronic Mail        James Jackson
                       National Aeronautics and Space Admin
                       21000 Brookpark Road
                       Mail Stop 142-7

                       Cleveland, OH 44135

| December 8, 2016 | /s/ |
| --- | --- |
| (Date) | Yvonne B. Robery |
| | Paralegal Specialist |

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2023-1984

**Short Case Caption:**  Globokar v. NASA

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes  3,741  words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date:  07/17/2023

Signature:  /s/ Miles K. Karson

Name:  Miles K. Karson

Save for Filing

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-1984

**Short Case Caption** Globokar v. NASA

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on _____

by  ☑ U.S. Mail    ☐ Hand Delivery    ☐ Email    ☐ Facsimile
    ☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Mary Ann L. Globokar | 20265 Bradgate Lane<br>Strongsville, OH 44149 |
|  |  |
|  |  |
|  |  |
|  |  |

☐   Additional pages attached.

Date: 07/17/2023

Signature: /s/ Miles Karson

Name: Miles Karson